# Appeal of John F. Hartranft, Governor of the Commonwealth, *et al.*

85      433
10SC 2358

1. The Governor is the absolute judge of what official communications, to himself or his department, may or may not be revealed, and is the sole judge not only of what his official duties are but also of the time when they should be performed.

2. The Governor is exempt from the process of the courts whenever engaged in any duty pertaining to his office, and his immunity extends to his subordinates and agents when acting in their official capacity.

3. The powers and duties of grand juries and the essentials of a *subpœna ad testificandum* discussed.

November 1st 1877.    Before Agnew, C. J., Sharswood, Mercur, Gordon, Paxson, Woodward and Sterrett, JJ.

4 Norris—28

[Appeal of Hartranft *et al.*]

*Certiorari sur appeal* to the Court of Quarter Sessions of *Allegheny county :* Of October and November Term 1878, No. 14.

This was the appeal of John F. Hartranft, Governor of the Commonwealth; M. S. Quay, Secretary of the Commonwealth; James W. Latta, Adjutant-General of the Commonwealth; General R. M. Brinton, and Major A. Wilson Norris, from the order of the Court of Quarter Sessions of the Peace of Allegheny county, allowing and directing attachments to issue against them in the matter of the investigation of the grand jury into the riots at Pittsburgh, of July 21st and 22d 1877.

The riots of July 1877 were inaugurated by a strike of the train men in the employ of the Pennsylvania Railroad Company, who proceeded to take possession of the trains of the company, and to stop all traffic over the road. Portions of the "National Guard" of the state were sent, under the charge of their regular officers, to open the road, and a collision took place between them and a mob led by the strikers, in which a number of persons were killed and wounded. Shortly thereafter large accessions were made to the mob, and a great riot ensued, in which all the buildings of the railroad company were burned, and thousands of cars, with their contents, were pillaged and destroyed. During the progress of this riot, a number of persons and several soldiers were killed and wounded.

At the next term of the Court of Quarter Sessions of Allegheny county, the court, Kirkpatrick, J., in charging the grand jury in relation to their duties, inter alia, said :—

"Secondly, you are ' diligently to inquire and true presentment make, * * * as well of those things which you know of your own knowledge.' By this is meant, that if of your own knowledge as a grand jury, or of the knowledge of either of you individually, or from the examination of witnesses in other cases, or if, from any source, offences and crimes are discovered by you, or any other matter by you deemed worthy of investigation, touching which no formal complaint has been made or indictment submitted to you, it is your duty to advise the court thereof, in writing, together with your wishes in the premises. This paper is called a *presentment*, and if, upon its submission and consideration, the court should be of opinion that your wishes should be complied with, they will direct a bill of indictment to be prepared accordingly and submitted to you, and it will be disposed of by you as if it had come before you in the usual and ordinary way. In the submission of your presentment * * * it is sufficient if it indicate your wishes and the substantial grounds on which they are predicated."

On the 1st of October 1877, the grand jury of Allegheny county presented a petition to the Court of Quarter Sessions, setting forth " that the citizens of said county are greatly concerned in having a careful investigation made of the late riots of July 21st

[Appeal of Hartranft *et al.*]

and 22d 1877, and all facts and particulars incident and relative thereto and connected therewith, and the grand jury do respectfully pray your Honor to give the said matter in charge to them to inquire concerning, and to furnish them compulsory process to secure the attendance of such witnesses as they may consider necessary to examine."

Upon this application was endorsed, "And now, 1st October 1877, the within presentment considered, approved, and ordered to be filed. *Per curiam.*"

On the same day a subpœna issued to several witnesses, and among them the parties to this writ. The subpœna was as follows: "We command you, that laying aside all business and excuses whatsoever, you and each of you be and appear in your proper persons before our grand jury, at Pittsburgh, at our Court of Oyer and Terminer and Quarter Sessions, there to be held for the county aforesaid, forthwith, to testify all and singular those things. which you shall know touching a certain investigation now being had on formal presentment by and before the said grand jury, relating to the late riots of July last in our said county, in our said court depending, and then and there to be tried, between the Commonwealth and ———, defendant, on the part of the ———. And hereof fail not, under penalty of one hundred pounds."

On October 12th 1877, after service of the above subpœna, the grand jury presented a petition to the court, stating that the witnesses had failed to appear after due notice, and praying the court "to adjudge the said parties and witnesses in contempt, and that further and compulsory process be awarded to said grand jury for the purpose of bringing the said recalcitrant witnesses to testify."

The court appointed the 15th of October to hear an argument on the application for an attachment, and at that time the following answer was filed:

"And now, October 15th 1877, George Lear, Attorney-General of the Commonwealth of Pennsylvania, comes into court, representing the said Commonwealth, and says that the Governor, as commander-in-chief of the army and navy of the state, Adjutant-General Latta, General R. M. Brinton, and Major A. Wilson Norris, against whom attachments have been applied for to compel their obedience to a subpœna to appear and testify before said grand jury, have no knowledge of the late riots in Allegheny county, except that which they learned in their military and official capacities, and which are privileged communications; and that he has learned this by an examination of their knowledge of the subject made personally of each of them on behalf of the Commonwealth; that, in their capacity of civil and military officers, they declare to him that, in the exercise of their official discretion, an examination into their acts in connection with said riots would be detrimental to the public service and injurious to the interests of the Common-

wealth; that they disavow any disrespect to the court or its process, and absent themselves on the ground that such matters as they could testify to are privileged communications, and not the subject of inquiry before a grand jury; that John F. Hartranft, Governer of the Commonwealth, and James W. Latta, Adjutant-General, are in constant correspondence with the army in the field in the disorderly and riotous regions of the state, and in daily expectation of being required at the front, and to be called to a distant county would endanger the interests of the public service; that all of said witnesses reside in counties remote from Allegheny, and not within the jurisdiction of process to answer, except in a matter or cause depending before the court. And the said Attorney-General further avers, that in the interest of public justice, and on behalf of the Commonwealth, he has, as the chief law officer of the state, examined the nature of the inquiry and the value of the testimony which these witnesses could give, and he is of the opinion that the interests of the state will be best subserved by their absence, and, therefore, he respectfully withdraws the application for attachment on behalf of the Commonwealth."

After the argument on the application for attachments, the court made the following order:—

"And now, 20th October 1877, after argument and upon consideration, the application is allowed, and attachments are hereby directed to be issued for and against the following named persons, being the same indicated by the grand inquest as in default, to wit: His Excellency John F. Hartranft, Governor of the Commonwealth; the Honorable M. S. Quay, Secretary of the Commonwealth; General James W. Latta, Adjutant-General of the Commonwealth; General R. M. Brinton, and Major A. Wilson Norris."

A writ of certiorari was thereupon taken in behalf of all against whom attachments were directed to be issued, and the following errors were assigned:—

1. The court erred in issuing a subpoena for witnesses beyond the limits of the county of Allegheny, to appear before the grand jury and not before the court, and in a matter not depending before the court.

2. In issuing a subpoena for witnesses to appear before the grand jury and testify in a matter touching a certain investigation now being had on formal presentment, by and before the said grand jury, relating to the late riots of July last, in our said county.

3. In allowing the attachments and directing them to be issued for and against the persons named by the grand jury, as in default upon a matter not depending before the court, or legally given in charge to the grand jury.

4. In issuing attachments against the Governor of the Commonwealth, Secretary of the Commonwealth, Adjutant-General, and other military officers of the state, in their official capacities, to testify

[Appeal of Hartranft *et al.*]

before the grand jury in an investigation touching riots which had occurred prior to the investigation, and in which no prosecution was pending before the court or grand jury.

5. In issuing an attachment against the chief executive of the Commonwealth.

*Thomas M. Marshall, Lyman D. Gilbert,* Deputy Attorney-General, and *George Lear,* Attorney-General, for appellants.—This was not a matter or cause depending before the judges or any of them, but an investigation before the grand jury. The subpœna commands the witnesses to appear before the grand jury. But the record shows that it was not on formal presentment, and that it was not depending in court.

There is no allegation, in the paper presented to the court, that the grand jury possesses any personal knowledge on the subject, nor averment against any parties as being identified with the riots. The investigation was at the instance of the citizens, and not under the direction of the court. The paper was approved and ordered to be filed, but there was no direction or order for process to bring witnesses before the court, to be sworn, and sent before the grand jury, which would have been the regular mode, if the court had power to institute a prosecution in that manner, which is not admitted. The prayer of the petition is not for such witnesses as the court may designate, but for such as the grand jury "may consider necessary to examine."

In this state the better opinion is that the grand jury can act only upon and present offences of public notoriety, and such as are within their own knowledge; such as are given to them in charge by the court, and such as are sent up to them by the district-attorney; and in no other cases can they indict without a previous prosecution before a magistrate, according to the terms of the Bill of Rights: 1 Whart. Cr. Law, ed. 1868, § 458, and note.

If the object of this proceeding is to establish crime and to punish criminals, it is irregular, for the following reasons: There has been no arrest, and there is no prosecution returned to court to which the subpœna is applicable. The grand jury cannot inculpate in such cases by presentment. They cannot subpœna witnesses to appear before them in any case, but the witnesses must be required to appear in court, and be sent before the grand jury: Respublica *v.* Shaffer, 1 Dall. 236.

The proceeding by which a court of its own motion gives a matter in charge to a grand jury is to be resorted to only in extraordinary cases, and to existing evils, those in progress, in which the evil is to be corrected by preventive, rather than punitive justice: Lloyd *v.* Carpenter, 3 Clark 188 ; Citizens' Association, 8 Phila. Rep. 478 ; Grand Jury *v.* Public Press, 4 Brewster 313.

[Appeal of Hartranft *et al.*]

The Governor and other officials are subpœnaed not as citizens, but by their official titles. Under these circumstances they cannot be compelled to testify.

The legislative, executive, and judicial departments of the government are distinct and independent, and each one should protect itself from the encroachments of the others : De Chastellux *v.* Fairchild, 3 Harris 18 ; Greenough *v.* Greenough, 1 Jones 489 ; Ervine's Appeal, 4 Harris 256 ; Burns *v.* Clarion County, 12 P. F. Smith 422 ; Richards *v.* Rote, 18 Id. 248 ; Commonwealth *ex rel.* Johnson *v.* Halloway, 6 Wright 446 ; Bagg's Appeal, 7 Id. 512.

Every department of the government has its secrets of state, or privileged comunications, which it is not only the right of the officers to refuse to disclose, but his duty to withhold : 1 Greenl. on Evidence, § 250, 251. The official transactions between the heads of the departments of state and their subordinate officers are in general treated as privileged communications. Thus, communications between a provincial governor and his attorney-general on the state of the colony, or the conduct of its officers ; or between the governor and a military officer under his authority ; the report of a military commission of inquiry, made to the commander-in-chief, and the correspondence between an agent of the government and a secretary of state, are confidential and privileged matters, which the interests of the state will not permit to be disclosed. The president of the United States, and the governors of the several states, are not bound to produce papers or disclose information communicated to them when, in their own judgment, the disclosure would, on public considerations, be inexpedient;'' Gray *v.* Pentland, 2 S. & R. 23 ; Yoter *v.* Sanno, 6 Watts 156.

And the officers are themselves the judges of the question whether such disclosure would be prejudicial to the public interests : 1 Burr's Trial 186 ; Gray *v.* Pentland, 2 S. & R. 23 ; Cooper's Case, 1 Wharton St. Tr. 662 ; Beatson *v.* Skene, 5 Hurlst. & N. Rep. 837. It is not a question for the court, but for the officers themselves to determine ; and the officers in this case having been subpœnaed by their official titles, it is to be presumed they are to testify in that capacity. The nature of the inquiry having been disclosed in the subpœna, the presumption is that the testimony required is concerning official action in reference thereto, and, in their answer filed for them, they say that such testimony would be prejudicial to the public service. They being the judges, that was a complete answer to the application for the attachment. Whenever the law vests any person with a power to do an act, and constitutes him a judge of the evidence on which the act may be done, and, at the same time, contemplates that the act is to be carried into effect, through the instrumentality of agents, the person thus clothed with power is invested with discretion, and is, *quoad hoc,* a

judge.   His mandates to his legal agents, on his declaring the
event to have happened, will be a protection to his agents ; and it
is not their duty or business to investigate the facts thus referred
to their superior, and to rejudge his determination.   In a military
point of view, the contrary doctrine would be subversive of all dis-
cipline ; and as it regards the safety and security of the United
States and its citizens, the consequences would be deplorable and
fatal : Vanderheyden *v.* Young, 11 Johns. 150, 158.

The courts cannot compel the Governor to perform any duties
appertaining to his office .; nor can they interfere with his discharge
of them, nor control him in any matter of executive discretion:
State of Louisiana, *ex. rel. v.* Warmouth, Governor *et. al.*, 22 La.
Ann. Rep. 1; Mauran, Adjutant-General, *v.* Smith, Governor, 8
R. I. Rep. 192 ; The People, *ex. rel. v.* Bissell, Governor, 19
Illinois 229 ; The State, *ex. rel. v.* Towns, Governor, 8 Georgia
360 ; Hawkins *v.* The Governor, 1 Arkansas 570.    Mott, *et. al.*
*v.* Pennsylvania Railroad Co., *et. al.*, 6 Casey 33.

In the case of Thompson *v.* The German Valley Railroad Com-
pany, 22 New Jersey Eq. 111, the chancellor said : " An order
to testify is an unusual, if not unheard of practice.   Such order
ought not to be made against the executive of the state, because
it might bring the executive in conflict with the judiciary.   If the
executive thinks he ought to testify in compliance with the opinion
of the court, he will do it without an order ; if he thinks it to be
his official duty in protecting the right and dignity of his office, he
will not comply even if directed by an order.   And in his case,
the court would hardly entertain proceedings to compel him by
adjudging him in contempt.   It will be presumed that the chief
magistrate intends no contempt, but that his action is in accordance
with his views of his official duty.   And in the present case, that
presumption amounts to a certainty.   Chief Justice Marshall, on
the trial of Burr, vol. 2, p. 536, remarks : ' In no case of this
kind would a court be required to proceed against the President, as
an ordinary individual.   The objections to such a course are so
strong and so obvious that all must acknowledge them.' "

The Governor can be punished in but one way for an abuse or
misuse of his power, and that is by impeachment.   If he can be
subpoenaed into any Court of Quarter Sessions or before any grand
jury to testify in behalf of the Commonwealth, and in his discre-
tion, under the advice of the legal department of the state, con-
cludes that the interests of the state in the administration of the
criminal law, will not be subserved by answering, and especially
where he is summoned to appear as Governor of the Commonwealth,
and, if for his default he can be attached for contempt, then the
barriers between the executive and judiciary are broken down, and
one department will be shorn of its independence of the others.

If the executive can be called into one county, he can be called

into them all ; and, unlike the other departments, his is continually·
in session, and he is always on duty.   If he can be called into
any county as Governor, not to testify to what occurred in the
county, but in the executive chamber, which no court or grand jury
can inquire into, it will be greatly to the detriment of the public
service.   If he can be arrested, fined, and imprisoned for not obey-
ing a subpœna in this case, it will be a great scandal on republican
institutions, and will shake public. confidence in the permanency of
our government.

*E. A. Montooth,* District-Attorney, *Morton Hunter,* Assistant
District-Attorney, *S. A. McClung,* and *George Shiras, Jr., contra.*
—Judge Kirkpatrick, in his charge to the grand jury, gave them
this matter in charge ; but, if not, the riot was undoubtedly within
their personal knowledge, and hence, under their oaths, they were
bound to present it.   This they did in accordance with the instruc-
tions of· the court, and asked for special power to investigate it.
That the grand jury meant this as their own official act, and not
merely that of individual citizens, is clearly shown by the beginning
and conclusion of the presentment itself.   They wished, as a grand
jury, to obtain additional facts, for the purpose of presenting the
offenders for indictment.   Thus is this case clearly distinguished
from that of the memorial of the citizens' association (8 Phila. 478),
cited by the other side.

The endorsement of the court upon their presentment, taken in
connection with the other circumstances of this case, was certainly
sufficient to empower the grand jury to make the investigations.

But this question is immaterial, for, as the subpœna was in the
proper form and regularly issued under the seal of the court, and
as the appellants were duly served therewith, they cannot answer
it by questioning the proceedings of the grand jury.   .

Are the Governor and the other appellants subject to subpœna?
Chief Justice Marshall says, that " it is not known ever to be
doubted, but that the chief magistrate of a state might be served
with a *subpœna ad testificandum :*" 1 Burr's Trial 177, *et seq. ;*
2 Id. 535.

That the others are subject to subpœna will scarcely be doubted.
It became their duty, therefore, when subpœnaed, to make a proper
response ; and, as the law makes no exception in their favor, they
should have responded in person.   Instead of this, however, the
Attorney-General filed an answer in their behalf.   If such answer be
permissible in any case, it should, at least, be made by the person
subpœnaed and verified by affidavit.

In this answer, and in the argument before this court, it is as-
sumed that the appellants were subpœnaed in their official character.
This nowhere appears.   The title follows the name, and may be
regarded merely as *designatio personœ.*   It is also assumed that it

[Appeal of Hartranft *et al.*]

was intended to examine them wholly in regard to their official acts, and upon privileged matters. This assumption is likewise gratuitous; but even if it were true, the answer is still insufficient. It was due to the dignity of the judiciary that they appear in person, and if any such question had been asked them, they could have availed themselves of their privilege in the ordinary way.

But are official communications in regard to this riot privileged? The only ground upon which such matters can be privileged is that of public policy, and it seems scarcely reasonable to suppose that the public interest would be injuriously affected by their disclosure several months after the riot occurred.

If, then, the appellants have failed to make a proper response to the subpœna, the right to attach them would seem to follow; and even if the Governor should be excused on account of his official duties, the others should certainly be required to appear in person, and submit themselves fully to the process of the court.

It is not intended to reflect upon the official conduct of the Governor or the other appellants, but if any question should be asked which might be made the basis of impeachment or prosecution, they could, of course, refuse to answer it.

On November 12th 1877, the chief justice announced that it was the judgment of the majority of the court that the order of the court below, granting the attachments, should be reversed. Opinion to be filed thereafter.

Mr. Justice GORDON delivered the opinion of the court, January 7th 1878.

Grand juries have the power to make presentment, not only of such criminal offences as may be laid before them by the district-attorney, in the form of bills of indictment, and of such as may come within the personal knowledge of individual members thereof, but, also, of all such matters as may be given them in charge by the court. Neither is there any doubt about the power of the court to direct that body to make inquiry concerning affairs which directly affect the public peace and society; among which affairs may be instanced great riots, such as those which recently disturbed the well-disposed citizens of Pittsburgh and its vicinity. Matters of this kind may properly be referred to the consideration of the grand inquest in order that the instigators thereof and the participants therein may be brought to justice; and this is the more necessary, because, in times of public tumult and alarm, private prosecutors may be overawed through fear of personal violence.

Doubtless the proceedings in the case before us are very irregular, since there seems to be a total inversion of the proper order of things. It was the duty of the court, not of the grand jury, first to move in the matter. In a subject of so much importance, and one requiring the exercise of so much care and discretion, the court

[Appeal of Hartranft *et al.*]

should have instructed this jury as to what it was to investigate, and in what manner the investigation was to be conducted. Nothing of the kind, however, was done; but the court, having approved its petition, suffered it to proceed to the adoption of its own subjects, after its own methods, and, by this sufferance, it allowed an important public investigation to pass from its own control to that of a body of men, which, as it was governed by no regular instructions, resembled more a committee for the general investigation of public affairs, than a lawful constituent of the Court of Quarter Sessions. This, however, is really of small importance to the matter in hand; neither can the appellants call in question the regularity of the proceedings as between the court and its grand jury; for if they have been properly subpœnaed, and can present no lawful excuse for their want of obedience to the mandate of the Quarter Sessions, they must stand convicted of a contempt, and we cannot help them. The subpœna is the process of the Commonwealth, and there is no doubt about the court's power to issue that process in proper cases.

Our inquiry, then, is limited to two propositions : Were the subpœnas regular, such as an ordinary citizen would be bound to obey? If so, were the appellants liable to attachment for disobedience to this process? The subpœna we have before us, like the other proceedings in this case, is very irregular. It is, indeed, but a general mandate of the court, ordering the appellants to appear, " to testify, all and singular, those things which they may know touching a certain investigation being had, on formal presentment, by and before the grand jury, relating to the late riots of July last, in said county, in said court depending." It sets forth no case, present or prospective, nor does it state for whom, or at whose instance, the defendants were to be subpœnaed. As this writ is a very arbitrary one, obliging the citizen to leave his home and abandon his business, however important it may be, and give his attendance at court, wherever that may be sitting, it is very important to know what parties are entitled to it ; for if it be issued at the suit of one having no right thereto, it is no contempt to disobey it. The Commonwealth may have this process in any proceeding where its interest is apparent, whether as a suitor or a prosecutor, and so may parties in courts, either civil or criminal; but we have yet to learn that any such right exists in a court, in its mere character as a court, separated from the case which it has in hand. So this, as well as every other compulsory process, must show upon its face that it was issued for some person or party having a right thereto, otherwise it is nugatory and void, and disobedience to its mandate involves no penalty whatever. In the case before us, there was the use of the writ of subpœna, as a mere order of the court, without statement of party or case, commanding the defendants to appear before the grand jury, for the purpose of giving their testimony

[Appeal of Hartranft *et al.*]

touching the late riots. If there is any law authorizing such process, we have not been informed of it.

No doubt the court might have directed a subpœna to have issued for the Commonwealth, in any case where the Commonwealth was a party, or where it was apparent it was in some way interested in some case or transaction then depending. So might it have directed a warrant to have issued for the arrest of some one guilty of a crime or misdemeanor, but in such case, no one would contend, that the mere blank warrant of the court would, in itself be sufficient to detain a citizen for one moment; the authority for such warrant must appear upon its face or it is worthless. But the courts' subpœna is no more respectable than its warrant; if the subpœna exhibit no authority it may be disobeyed with impunity. Now, in the case before us, the Commonwealth was not a party in interest, or, if so, it is not now apparent. It seems, from the petition of the grand jury, that the citizens of the county of Allegheny " were greatly concerned in having a careful investigation of the late riots," but whether they were concerned in bringing the rioters to justice or not, is not stated, though this was the only matter in which the Commonwealth could be concerned. Moreover, as the grand jury was acting under no instruction, it was not possible, even for the court, to know what that jury was doing or intended to do, but, of this, the court should have been informed, before it undertook to interfere with the personal liberty of the citizen by its summary process of attachment, for, as the matter now stands, it is apparent that the subpœna was issued for no tangible cause or party and for no properly defined legal purpose; hence, no one was bound to obey it.

For the purposes of this case, however, we may admit the regularity of this subpœna and that, upon an ordinary citizen, it would have been binding and obligatory, for we regard the question of the liability of the appellants to attachment, in any event, as the prime one of this case. In order to resolve this, we must first understand who the persons are, against whom the court has directed its attachment and for what purpose they have been subpœnaed. They are the Governor of Pennsylvania, the Secretary of the Commonwealth, the Adjutant-General, chief officers of the Executive Department of the state government, and two officers of the National Guard; the latter subordinates acting under the orders of the former. The purpose, for which these officers are subpœnaed, is, that the grand jury may be put into possession of any information they may be possessed of, or that may be within the power of their several departments, concerning the military or other means used by them in the suppression of the late riots in the city of Pittsburgh. It will be observed that these persons are subpœnaed for the purpose of compelling a revelation of such things as have come to their knowledge in their official capacities, and which strictly belong to

[Appeal of Hartranft *et al.*]

their several departments as officers of the Commonwealth. This is clearly set out in the answer, by the Attorney-General, to the application for the attachment, and there has been no denial thereof upon the argument before us. In order to simplify matters, we may treat this case just as though the process, first and last, were against the Governor alone; for if he is exempt from attachment because of his privilege, his immunity protects his subordinates and agents. The general principle is, that whenever the law vests any person with the power to do an act, at the same time constituting him a judge of the evidence on which the act may be done, and contemplating the employment of agents through whom the act is to be accomplished, such person is clothed with discretionary powers, and is *quoad hoc* a judge. His mandates to his legal agents, on his declaring the event to have happened, will be a protection to those· agents: Vanderheyden *v.* Young, 11 Johns. 158, per Spencer J.

It follows, if the Governor, as supreme executive, and as commander in chief of the army of the Commonwealth, is charged with the duty of suppressing domestic insurrections, he must be the judge of the necessity requiring the exercise of the powers with which he is clothed, and his subordinates, who are employed to render these powers efficient and to produce the legitimate results of their exercise, can be accountable to none but him. In like manner, if he is constituted the judge of what things, knowledge or information, coming into his department through himself personally or from his subordinates, may or may not be revealed, then such subordinates, without his permission, cannot be compelled to disclose, in court, any such matters or information.

What, then, are the duties, powers and privileges of the Governor? In the language of the constitution, art. 4, sect. 2, "The supreme executive power shall be vested in the Governor, who shall take care that the laws be faithfully executed." Also, same article, sect. 7, "The Governor shall be commander-in-chief of the army and navy of the Commonwealth, and of the militia, except when they shall be called into the actual service of the United States." He is, also, invested with the appointing and pardoning powers; the power to convene the legislature in cases of emergency and to approve, or veto, bills submitted to him by the General Assembly. It is scarcely conceivable that a man could be more completely invested with the supreme power and dignity of a free people. Observe, the *supreme executive power* is vested in the Governor and *he is charged with the faithful execution of the laws*, and for the accomplishment of this purpose he is made commander-in-chief of the army, navy and militia of the state. Who then shall assume the power of the people and call this magistrate to an account for that which he has done in discharge of his constitutional duties? If he is not the judge of when and how these duties are to be performed, who is? Where

does the Court of Quarter Sessions, or any other court, get the power to call this man before it, and compel him to answer for the manner in which he has discharged his constitutional functions as executor of the laws and commander-in-chief of the militia of the Commonwealth? For it certainly is a logical sequence that if the Governor can be compelled to reveal the means used to accomplish a given act, he can also be compelled to answer for the manner of accomplishing such act. If the Court of Quarter Sessions of Allegheny county can shut him up in prison for refusing to appear before it and reveal the methods and means used by him to execute the laws and suppress domestic violence, why may it not commit him for a breach of the peace, or for homicide, resulting from the discharge of his duties as commander-in-chief? And if the courts can compel him to answer, why can they not compel him to act? All these things, we know, may be done in the case of private individuals; such an one may be compelled to answer, to account and to act. In other words if, from such analogy, we once begin to shift the supreme executive power, from him upon whom the constitution has conferred it, to the judiciary, we may as well do the work thoroughly and constitute the courts the absolute guardians and directors of all governmental functions whatever. If, however, this cannot be done, we had better not take the first step in that direction. We had better at the outstart recognise the fact, that the executive department is a co-ordinate branch of the government, with power to judge what should or should not be done, within its own department, and what of its own doings and communications should or should not be kept secret, and that with it, in the exercise of these constitutional powers, the courts have no more right to interfere, than has the executive, under like conditions, to interfere with the courts. In the case of Oliver *v.* Warmouth, 22 La. 1, it was held (per Taliafero, J.), that, under the division of powers, as laid down in the federal and state constitutions, the judiciary department has no jurisdiction over or right to interfere with, the independent action of the chief executive, in the functions of his office, even though the act he is required to perform be purely ministerial. This is putting the matter on very high grounds, for, in such case, no other officer would be exempt from the mandatory power of the judiciary. No case could more forcibly exhibit the extreme reluctance of courts to interfere with the functions of the supreme executive, for the hypothesis put is the refusal of the Governor to perform a duty, cast upon him by law, of a character strictly ministerial. We think, however, that the ground upon which this decision stands, is substantial; for, as the learned justice well argues, the difficulty arises in the attempt to establish a distinction between ministerial and discretionary acts as applied to the Governor, and then to conclude that the former may be enforced by judicial decree; it is objected, however, that the doctrine is

[Appeal of Hartranft *et al.*]

unsound in this, that it gives to the judiciary the large discretion of determining the character of all acts to be performed by the chief executive; that this would infringe his right to use his own discretion in determining the very same question; that he must, necessarily, have the unconditional power of deciding what acts his duties require him to perform, otherwise, his functions are trammelled and the executive branch of the government is made subservient to the judiciary. The principle enunciated, in the above stated case, applies with greater force to that we now have under consideration; for if the Governor's discretion may not be interfered with, in a matter purely ministerial, much more may that discretion not be interfered with in a case which pertains to his office and duties as commander-in-chief, in the discharge of which, the constitution makes that discretion his peculiar and absolute prerogative.

Again, the Governor, having a proper regard for the dignity and welfare of the people of the Commonwealth, is not likely to submit himself to imprisonment, on the decree of the Court of Quarter Sessions, or to permit his officers and coadjutors to be thus imprisoned. Were we, then, to permit the attempt to enforce this attachment, an unseemly conflict must result between the executive and judicial departments of the government. We need not say that prudence would dictate the avoidance of a catastrophe such as here indicated. On this point, the case of Thompson *v.* The German Valley Railroad Co., 22 N. J. Eq. R. 111, furnishes us with a precedent well worthy of our consideration. In that case a *subpoena duces tecum* had been served on the Governor of New Jersey, commanding him, by his individual name, to appear and testify before an examiner of the Court of Chancery, and bring with him an engrossed copy of a private statute which had been passed by the legislature, and had been sent to him, as Governor, for his approval. He refused to obey the subpoena, informing the court, at the same time, that he did not refuse out of any disrespect to the court or to the law, *but because he thought his duty required him not to appear or produce the paper required, or to submit his official acts, as Governor, to the scrutiny of any court.* It will be seen that the case thus presented is quite as strong as that under discussion; for the Governor, upon his own opinion of duty, which, as it will appear, did not accord with that of the court, not only refused to appear or produce the required paper, but to submit any of his official acts to the scrutiny of the court. An order was granted on the Governor, to show cause why he should not appear and testify. After argument, Zabriskie, Chancellor, said: "The Governor cannot be examined as to his reasons for not signing the bill, nor as to his action, in any respect, regarding it. But there is no reason why he should not be called upon to testify as to the time it was delivered to him. That is a bare fact that includes no action on his part. To this extent, at least, I am of opinion

that he is bound to appear and testify. But I will make no order on him. for that purpose. Such order ought not to be made against the executive of the state, because it might bring the executive in conflict with the judiciary. If the executive thinks he ought to testify, in compliance with the opinion of the court, he will do so without order; if he thinks it to be his official duty, in protecting the rights and dignity of his office, he will not comply, even if directed by an order. And, in his case, the court would hardly entertain proceedings to compel him by adjudging him in contempt. It will be presumed the chief magistrate intends no contempt, but that his action is in accordance with his official duty." If we adopt this opinion as a sound exposition of the law, the case before us is determined; for the matter is left to rest solely on the opinion of the executive, although his opinion be clearly contrary to that of the court. We are inclined to think the conclusion thus reached is wise and discreet; and it is supported by the best text writers of our times. These state the law to be, that the President of the United States, the governors of the several states and their cabinet officers, are not bound to produce papers or disclose information committed to them, in a judicial inquiry, when, *in their own judgment,* the disclosure would, on public grounds, be inexpedient: 1 Greenf. on Ev., § 251; 1 Whart. Law of Ev., § 604. Thus, the question of the expediency or inexpediency of the production of the required evidence is referred, not to the judgment of the court before which the action is trying, but of the officer who has that evidence in his possession. The doctrine that the officer must appear and submit the required information or papers to the court, for its judgment as to whether they are, or are not, proper matters for revelation, is successfully met and settled in the case of Beaton *v.* Skene, 5 Hurlst. & N. 838, per Pollock, C. B. It was there held, that if the production of a state paper would be injurious to the public interest, the public welfare must be preferred to that of the private suitor. The question then arose, how was this to be determined? It must be determined either by the judge or by the responsible crown officer who has the paper. But the judge could come to no conclusion without ascertaining what the document was or why its publication would be injurious to the public service. Just here, however, occurred this difficulty, that, as judicial inquiry must always be public, the preliminary examination must give to the document that very publicity which it might be important to prevent. The conclusion reached was, that from necessity, if for no other reason, the question must be left to the judgment of the officer.

A like case is that of Gray *v.* Pentland, 2 S. & R. 23. A subpœna had been issued from the court below and served upon Governor Snyder and Secretary Boileau, with a *duces tecum;* a rule was also entered for the purpose of taking their depositions in Harrisburg. They declined to appear in answer to the subpœna,

[Appeal of Hartranft *et al.*]

or to permit their depositions to be taken under the rule, and refused to produce the paper or deliver it to the plaintiff.   This paper was of very great importance, inasmuch as its production was necessary for the maintenance of the suit pending, the Supreme Court holding that, though it was beyond the plaintiff's power, parol evidence of its contents was not admissible.   A motion was then made, on the part of the plaintiff, for a special *subpœna duces tecum* to compel the production of the paper, but this was refused. On argument in the superior court this action of the court below in refusing compulsory process against the Governor and Secretary of the Commonwealth does not seem to have been questioned; on the other hand, it was approved in opinions delivered by TILGHMAN, C. J., and BRACKENRIDGE, J.   The latter was, as he said, inclined to think that the Governor could not be compelled to produce the paper transmitted to him; that it was within his own discretion to furnish or refuse it; and this on the ground of public policy.   The chief justice observed, inter alia, that the Governor, who best knew the circumstances under wnich the charge had been exhibited to him, and could best judge the motives of the accuser, must exercise his own judgment with respect to the propriety of producing the writing..   Thus the matter is treated as quite beyond the power of the court, and the judgment of the executive is regarded as absolute and final.

We next refer to the celebrated trial of Aaron Burr.   Here is the case of one charged with treason; one who, by the express terms of the constitution, was entitled to compulsory process for obtaining witnesses in his favor.   The judge before whom the examination was conducted was John Marshall, Chief Justice of the Supreme Court; a man renowned, not only for his legal learning, but also for his judgment and sagacity as a statesman; and the President was Thomas Jefferson, one not likely unduly to exalt executive prerogative or to refuse to the judiciary its just tribute of respect.   We may, therefore, presume that whatever was done by the principal actors in the remarkable judicial drama then in progress, was well done.   At the request of the defence a *subpœna duces tecum* was awarded and directed to the President requiring him to appear, and bring with him a certain letter from General Wilkinson to himself.   He refused either to appear or produce the paper required.   On discussion of the question, not whether compulsory process should be awarded against the President, for that was not so much as proposed, but whether the attorney-general should permit the defence to have the examination of a copy of the required letter which had been put into his possession, the chief justice said (as we find it set down in vol. 3, p. 37, Burr's Trial, as published by Westcott & Co., Washington City, 1807): "I suppose it will not be alleged in this case that the President ought to be considered as having offered a contempt to the

[Appeal of Hartranft et al.]

court in consequence of his not having attended, notwithstanding the subpœna was awarded agreeably to the demand of the defendant; the court would, indeed, not be asked to proceed as in the case of an ordinary individual." We find, also, in vol. 2, p. 536, of the same trial, published by Hopkins & Earle, Philadelphia 1808, the following recorded as the utterance of the chief justice: "In no case of this kind would the court be required to proceed against the President as against an ordinary individual. The objections to such a course are so strong and obvious that all must acknowledge them. * * * In this case, however, the President has assigned no reason whatever for withholding the paper called for. The propriety of withholding it must be decided by himself, not by another for him. Of the weight of the reasons for and against producing it he himself is the judge."

Influenced by this and the other precedents we have cited, as well as by reason and necessity, we are in like manner disposed to conclude that the propriety of withholding the information required by the grand jury, must be determined by the Governor himself: and the weight of the reasons influencing him in the conclusion at which he has arrived, is for himself and not for the court to consider.

Furthermore, as the Governor is the chief executive of the Commonwealth, and as such embodies the power of the people, for the conservation of the peace and the protection of the rights and property of the citizens of the state, as he is also part of the legislative branch of the government, it must be obvious to every one that there are times when he must be excused from the ordinary process of the courts. We presume it will not be contended that he would be obliged to obey the mandate of a subpœna during the sessions of the legislature, when his presence at the capitol is constantly required, or whilst engaged in the suppression of an insurrection. These, however, do not embrace all his duties as Governor; we must, therefore, go one step further, and concede that he is exempt from such process whenever engaged in any duty pertaining to his office. Granting that there may be times when he is not so engaged, and when he might be free to answer to a subpœna, who is to be the judge of his engagements or disengagements? May he be compelled to appear before a court and submit himself to the judgment thereof as to whether his duties, just then, require him to be in his office at Harrisburg, or at the head of the army in the field, or whether he may not have a few days of leisure, during which he may await the will and pleasure of a grand jury? It will be conceded that in all ordinary cases, he must himself judge as to what things he must do and what things he must leave undone, and that this is a duty imposed upon him by the constitution. But how then shall a court at any time, step in and assume the power of judging for him? This cannot be done except by an unwarrantable assumption of

4 Norris—29

[Appeal of Hartranft *et al.*]

executive prerogative.   The same reasoning which brings us to the conclusion that the Governor is the absolute judge of what official communications to himself or his department, may or may not be revealed, in like manner leads us to conclude that he must be the sole judge, not only of what his official duties are but also of the time when they should be attended to.   The Governor, disavowing any disrespect to the court or its process, has answered that, in consequence of his constant communication with the state forces, now in the field, in the disorderly and riotous districts, his time is fully occupied in the discharge of the duties of his office, and that to leave his post would endanger the interests of the public service. This brings us face to face with the question, whether the executive, or the courts for him, are to determine the character of his official duties and the order in which they may be performed.   For instance, is obedience to a subpoena one of his duties, and if so, shall he discharge that duty in preference to that which rests upon him as commander-in-chief?   The answer to this question is easy ; for if the courts can in any one instance or at any one time, control or direct the executive in the performance of his duties, they may do so in every instance and at all times.   We need not waste time in the attempt to prove that this proposition is not allowable ; that the Governor cannot thus be placed under the guardianship and tutelage of the courts.   To the people, under the methods prescribed by law, not to to the courts is he answerable for his doings or misdoings.   It is his duty from time to time, " to give to the General Assembly information of the state of the Commonwealth," but it is not his duty to render such an account to the grand jury of Allegheny or any other county.   Whilst, therefore, the motives of the Court of Quarter Sessions in granting the process before us, are not to be lightly impugned, yet we have no doubt it exceeded its jurisdiction in attempting to interfere with the executive prerogative.

Let the attachment be set aside.

Chief Justice AGNEW and Mr. Justice STERRETT dissented, the chief justice filing the following opinion.

The question before us belongs to the enduring theme of civil liberty, and not to ephemeral interest, passion or feeling.   It falls within the emphatic words of the Declaration of Rights that " all power is inherent in the people, and all free governments are founded on their authority and instituted for their safety, peace, and happiness :" Sec. 2.   The question is, whether any citizen, private or official, is above the process of that law, which protects and enforces these essential rights of the people—rights " excepted out of the general powers of government" in order to " guard against transgressions of the high powers delegated" to the mere organs of government : Sect. 26.

It is therefore a misfortune that this question has been marred

[Appeal of Hartranft *et al.*]

by false issues.  The course of the railroad company, or its men ; the behavior of the troops, near or remote ; the action of the citizens of Pittsburgh, and the conduct of the Governor and his officers, have nothing to do with the question we must consider—a question belonging solely to the realm of law, and only obscured when false issues intervene.  Like the glass of the astronomer, cleared of all distorting and prismatic rays, the judicial mind should be free from every divergent influence and discoloring bias.

The 21st and 22d of July last were days of great alarm in this city, and a series of fearful riots bore terror to the hearts of its inhabitants.  In the midst of the tumultuous mass an armed military appeared.  Pistols and muskets were fired, many were wounded, and more than twenty lives of citizens and soldiers were taken.  Two millions or more of property were destroyed.  A hundred locomotives were ruined, the roundhouse, and other railroad buildings, the great hotel, the grain elevator, and many hundred cars were burned.  Vast amounts of merchandise of distant owners were consumed or stolen, and for nearly a mile the railroad tracks were covered with car-wheels, bars, bolts, and iron machinery of every kind.

A monstrous crime was committed.  Blood ran in streams.  Was this murder, manslaughter, or excusable or justifiable homicide ?  Property was despoiled.  Was this arson, robbery or theft ?  Whose was the crime ?  Wrongheaded men united to remedy grievances by conspiracy and violence.  A military force intervened.  Death and spoil ensued.  Were they called thither by lawful authority ; or did they come at private bidding ?  Did the military attack, or were they attacked ?  Did they fire at command or by individual will ?  These were the fearful questions to be answered by some competent lawful authority.  The state and distant communities are involved in the answer.  The laws of the state have been violated, the " peace " of the people broken, and their " safety and happiness " endangered.  To whom is inquiry given to obtain the facts, and present the guilty for trial and punishment ?  Not to the legislature.  It has no judicial power.  Not to the Governor.  His duty is to " take care that the laws shall be faithfully *executed*."  He can neither try nor punish crime.  Even a coroner's inquest, *super visum corporis*, is totally inadequate to determine the full scope, character and purpose of a riot of this immense magnitude, and the various parts played by all the actors.  ·No individual pursuit can suffice, for private prosecutors have neither the interest, the inclination, nor the ability to reach the breadth and scope of such a scene of bloodshed and ruin.

To the judiciary alone belongs this power and duty ; to it only is the means given to summon juries and witnesses for both inquiry and trial.  Under the constitution and laws of the land, it only can act.  Hence, the Act of 16th June 1836, "relating to

the jurisdiction and powers of the courts," and embracing all courts, commits to the Oyer and Terminer authority "to *inquire* by the oaths and affirmations of good and lawful men of the county of all crimes committed or triable in such county," and also "to hear, determine, and punish the same:" Sect. 14. To the Court of Quarter Sessions is given "the jurisdiction and power" "to *inquire* by the oaths or affirmations of good and lawful men of the county, of all crimes, misdemeanors, *and offences whatever*, against the laws of this Commonwealth, which shall be triable in the respective county:" Sect. 16. It is then empowered to certify into the Oyer and Terminer all offences cognizable there, and to try those over which it has jurisdiction. After the distribution of powers to the several courts—Common Pleas, Quarter Sessions, Oyer and Terminer and Orphans' Court—the act then gives to all alike certain powers, viz. : to levy and recover fines, forfeitures, &c. : Sect. 20. To make rules of practice, &c. : Sect. 21. The 23d section proceeds : "Each of said courts is empowered to issue writs of subpœna under their official seal into *any county* of this Commonwealth, to summon and bring before the respective court *any* person to give testimony in *any* cause or *matter* depending before them, under the penalties hitherto appointed and allowed, in any such case by the laws of this Commonwealth." The Act of 14th April 1834, " relating to the organization of the courts of justice," makes the grand, as well as the petit jury, a lawful part or arm of the court for the administration of justice. The power to compel witnesses to come before the grand jury is, therefore, precisely on the same footing, as to require them to appear before the petit. Both are derived from the same law, and stand on the same power, the act being careful to command *any* person to appear to testify in *any matter* as well as *any cause.* And if the law had not been so precise, the power would necessarily flow from the "jurisdiction and power" conferred to "*inquire* by the oaths and affirmations of good and lawful men of the county, of all crimes, misdemeanors, and offences whatever against the laws of this Commonwealth." There is common-law authority also. Says Hawkins, in his Pleas of the Crown (vol. i., ch. 6, p. 65): "It is also a high crime to disobey the king's lawful command or prohibition, as for refusing to give evidence to a grand jury concerning a crime, for which the court may impose an immediate fine." This was decided by Lord Holt in The King *v.* Lord Preston, committed by the Court of Quarter Sessions for refusing to give evidence to the grand jury: 1 Salk. 27–8. The same law is stated by Mr. Chitty, vol. i., Cr. Law 320. Another evidence that the source of this power arises in the jurisdiction of the court acting by means of its grand jury arm, is the fact that the court will, in delicate cases, direct the evidence to be heard in the court, so that the grand jury may be

better assisted in the performance of their duties : 1 Chitty Cr. Law 312, 313.

An immense riot, involving high crimes, and a multitude of persons whose identity, names, participation and guilt or innocence must be ascertained, in order to proceed to trial and punishment, can be brought to legal knowledge only by a grand jury charged with this duty. A riot is one of those great public offences which is conceded by the authorities to be the special subject of inquiry in this mode. If, then, the court can charge the grand jury as its legally appointed means, expressly given by the Act of Assembly, to make inquiry, it follows, as a necessary logical consequence, that the inquiry must be made *per testes* brought before them by due process of law ; for the scope, and all parties to such a riot, cannot be a matter of personal knowledge.

This much said upon the grand jury as a constituent in the administration of criminal jurisprudence ought to be sufficient. But its powers have been denied, rendering something more necessary. It is one of the boasted bulwarks of English liberty handed down to us, and protected by the Declaration of Rights. No man can be tried for a crime except upon a bill of indictment duly found by a grand jury. Hence, the accused may challenge the array or individual jurors : Brown *v.* Commonwealth, 23 P. F. Smith 321 ; Id., 26 Id. 319 ; Lynch *v.* Commonwealth, 27 Id. 205. " Our laws (says a well-known writer) have therefore wisely and mercifully placed the strong twofold barrier of a presentment and a trial by jury between the liberties of the people and the prerogative of the crown :" 2 Tomlin's Law Dict. 307. Therefore the constitution declares : " The trial by jury shall be as heretofore, and the right thereof remain inviolate." Sect. 6. " Heretofore" means according to the course of the common law : Van Swartow *v.* Commonwealth, 12 Harris 131. The oath of the grand jury is, " diligently to inquire, and a true presentment make, as well of all such matters as shall be *given them in charge* as of those things which they *may* know of their own knowledge." " Grand juries (says Judge Addison) inquire only into crimes, but they inquire of *all* crimes." " No criminal charge can be brought into a court of justice in this state unless it have acquired the sanction of a grand jury :" App. 36. " To the grand jury (he says) is committed the preservation of the peace of the county, the care of bringing to light for examination, trial and punishment, all violence, outrage, indecency and terror, everything that may occasion danger, disturbance or dismay to the citizens. Grand juries are watchmen stationed by the laws to survey the conduct of their fellow-citizens, and inquire where and by whom public authority has been violated, or our constitution and laws infringed :" App. 47–8. Speaking of the judicial branch of the government, he says : " This branch consists of two superior parts, a court and

[Appeal of Hartranft *et al.*]

jury."   *   *   *   "Juries selected from the people by an officer
of their own election are so numerous and so frequently changed,
that they may well be considered as the people themselves exercis-
ing this branch of the administration :" App. 55.

A *charge* to a grand jury to inquire of a matter is either oral
by the court, or in writing by the district-attorney in the form of
a bill.   The oral charge is where criminal courts (says Judge King)
"of their own motion call the attention of grand jurors to, and
direct the investigation of matters of general import; which from
their nature and operation in the entire community justify such
investigation."   "Such (he says) as great riots that shake the
social fabric, carrying terror and dismay among the citizens :" 1
Whart. Cr. Law, sect. 458, note.

Thus the constitutional power of the grand jury to inquire into
the riots of July 21st and 22d being fully established, the inquiry
implies evidence, evidence implies witnesses, and witnesses the
process to bring them.   Here I must notice two technical objections,
one that the subpœna commands attendance before the grand jury
itself.   This is wholly unsubstantial.   According to ancient practice
the grand jury having no power to administer oaths, the witnesses
came into open court, were sworn there, and then orally commanded
to go before the grand jury : 1 Chit. Cr. Law 312, 313.   This is
noticed in the note to 7th Smith's Laws 686, and the practice of
other states recommended to be adopted, of sending the witnesses
at once before the grand jury, and saving the time of the court.
Accordingly long ago a law was passed (now incorporated into the
Criminal Procedure Act of 1860) authorizing the foreman to ad-
minister the oath.   The witnesses are now sent immediately up.
The subpœna, therefore, under the seal of the court, tested by the
judge and signed by the clerk, was strictly correct in commanding
the witnesses to appear before the grand jury.   It is the written,
instead of oral, order of the court.

Another objection is that it states no parties.   This is made
without adverting to the fact that it is process awarded upon an
inquiry, and before parties are known.   The very purpose of the
inquiry is to ascertain the parties to be presented for indictment.
It is strictly proper and fully to the purpose, viz : "To testify all
and singular those things you shall know touching a certain inves-
tigation now being had on formal presentment by and before the
said grand jury, relating to the late riot in July last in our said
county."   This is sufficient for the purpose of inquiry.   The re-
mainder of the printed form used by the clerk was necessarily left
a blank, there being no parties to be named in it.   It was neces-
sarily on the part of the Commonwealth, for a defendant cannot
appear with witnesses before the grand jury.   It was asserted in
argument that the grand jury had no special charge to ground the
inquiry.   This is wholly incorrect.   I have read the able charge

of Judge Kirkpatrick, and find it direct and pointed upon these very riots, and very full of instruction upon the entire subject of riots, routs, and unlawful assemblies. But if it were not so clear and pointed, it was followed by a special written request of the grand jury, " to give the said matters (these riots) in charge to them, and to furnish them compulsory process to secure the attendance of such witnesses as they may consider necessary to examine." This paper was endorsed by the judge himself, " considered, *approved*, and ordered to be filed." Here then was a direct committal to the grand jury, and the process was issued accordingly.

Much space has been devoted to a vindication of the jurisdiction of the court and the province of a grand jury. But the lustre of this great common-law heritage for the protection and security of the people, and the light it has borrowed from our own legislation, have been so dimmed by denial and obscured by doubt, it has seemed to be necessary. The labor, moreover, is not vain, for all this bears directly on the great question to be considered, to wit : the constitutional power of the court to require the Governor of the state to appear for examination before this arm of its jurisdiction.

We come now to this immediate question, and the first point to be noticed is the argument that he is exempt from a subpœna because he is a *co-ordinate* branch of the state government. What is co-ordination or *equality of rank*, under the constitution ? It is not the absolute independence of each. If it were, the end would be disorder, conflict, and finally disorganization. It is not absolute superiority each over the others, for then they would not co-exist in unity, as essential parts of the same common whole. The constitution is the written will of the people, in its entirety, and all its parts must necessarily cohere without jarring, in order to effectuate that will. Equality of rank implies no superiority, except in the exercise of the particular function confided to that rank. Co-ordination is merely the vesting of the separate functions of making, determining and executing laws, in different persons, that thereby the union of all in one person or body may not work injury to the public welfare. The Assembly cannot try causes or execute process, the Governor cannot legislate or decide judicial controversies, and the Judges cannot make and execute laws. This is the general distribution of the powers of the government, yet the constitution itself does not strictly adhere to it. Thus the legislature may make certain inquiries, and try certain cases, *e. g.*, the election and qualification of members, contempts, expulsions. The Governor approves or vetoes bills, and the courts superintend and enforce the execution of process. But from the very nature of co-ordination in one and the same government, and the distribution to each branch of its appropriate functions, each is necessarily supreme in its own department, for neither can freely exercise its proper functions if it can be obstructed by the other. For example, *the judiciary*

[Appeal of Hartranft *et al.*]

*cannot control or interfere with the discretion of the Governor in the exercise of an executive function.* And for the same reason the legislative and executive branches cannot control the appropriate functions of the judicial. If the legislative or executive can oppose or obstruct the exercise of an appropriate judicial power the purpose of separation is defeated; a practical union takes place in them, and the surrender by the judiciary is effected. One of the appropriate and exclusive functions of the judiciary is the detection, trial and punishment of offenders against the law. On the true principles of constitutional co-ordination, therefore, the Governor cannot obstruct this function, and must yield obedience to the judicial branch in this respect as the appropriate and superior repository of the power conferred by the people themselves. When arguments are properly drawn from the distribution of the powers of government among co-ordinate branches their force must be conceded. But when their use is inconsistent with the rights of the people who have made this distribution for their own benefit, the argument is fallacious. Then it flies in the face of the Declaration of Rights (sect. 2, already quoted), "that all power is inherent in the people, and all free governments are founded on their authority, and instituted for their peace, safety and happiness." This right being reserved by the 26th section out of the powers conferred in the constitution, it follows no use can be made of the distribution of powers prejudicial to their "peace, safety and happiness." The appropriate function of the judiciary being the detection, trial and punishment of offenders, and the inquiry for this purpose by witnesses being the constitutional and legal mode of procedure, it is equally clear the Governor, just as any other citizen, being subordinate to the judicial power *in this respect*, must yield his obedience to the process necessary for the exercise of this judicial function. Good government and the welfare of the people demand this.

This superior function of the judiciary is to be seen in another aspect. There never was a time when it has not been engaged in passing upon the acts of both the other branches, in resolving the constitutionality and interpretation of laws, and the regularity of executive acts. This needs no citation of authority. "It is idle," says C. J. GIBSON, "to say the authority of each branch is defined and limited in the constitution, if there be not an independent power able and willing to enforce its limitation." "From its very position it is apparent that the conservative power is lodged with the judiciary, which, in the exercise of its undoubted right, is bound to meet every emergency." "It has become," he adds, "the duty of the court to temporize no longer, but to resist, temperately, though firmly, any invasion of its province, whether great or small:" De Chastellux *v.* Fairchild, 3 Harris 18. How futile would be the judicial power to punish crime, or vindicate innocence, if the Gov-

ernor, having exclusive knowledge of facts bearing upon either, could defy the process of the law at pleasure. To argue that his official character is a ground of denial of obedience, is to rob the people, whose servant he is, of their undeniable right to the due administration of justice, through that department of the government to which they have committed the right of judgment. To say he may be liable in an action for damages, is no response. If not bound to appear, no right of action can exist, for he is under no duty to the party. If it be a criminal prosecution, there is no party to whom he could respond. So impeachment cannot reach him, for that is no impeachable offence which is no violation of duty. An obligation to answer the subpœna is the postulate in either case. To say he must appear upon an indictment, and need not upon a legal inquiry, is equally unsound. For the inquiry of a grand jury is, as we have seen, the constitutional exercise of the power of the court, in order to try and punish offenders. To discriminate between inquiry and trial, as a question of power, is to emasculate judicial rights, and dethrone those of the people.

And now we may crave aid from other sections of the Declaration of Rights. " In all criminal prosecutions, the accused hath a right inter alia to have compulsory process for obtaining witnesses in his favor, and in prosecutions by indictment or information, a speedy public trial by an impartial jury of the vicinage :" Sect. 9. " All courts shall be open, and every man for an injury done him in his lands, goods, person, or reputation shall have remedy by due course of · law, and right and justice administered without sale, denial, or delay :" Sect. 11. These may be taken in connection with the 6th sect.: " that trial by jury shall be as heretofore, and the right thereof remain inviolate." Trial as *heretofore*, we have seen, implies inquiry and indictment. Now, the private rights of individuals, as thus enforced, are manifestly not superior to the administration of public justice for the welfare of the people as set forth in the 2d sect. already quoted. Indeed, public rights are in many respects superior to individual rights, and the enforcement of the private right of a speedy trial implies the public duty, as well as right, to prosecute offenders, and consequently the means of doing so. Thus in every aspect the constitution, as the supreme law, commands the presence of every person, in private or official life, when his testimony is necessary for the due administration of justice. If, then, he be liable to process, and bound to appear, it is a necessary corollary, that he is liable to attachment for his disobedience to the command of the law.

The argument *ab inconveniente*, that it is necessary the Governor should always be at the seat of government, is preposterous, in view of frequent visits elsewhere, of business, courtesy, and pleasure. The absence of the Governor in the Rocky Mountains, on his way to California, at the time of these riots, is an apposite example.

.[Appeal of Hartranft *et al.*]

When his presence is needed elsewhere, no court in the state would soil its ermine by a rude assault on his person. In all governments, composed of co-ordinate organs, there will be some friction; but right-minded men, mindful of their just powers, and their own dignity, are ever ready to pour oil on the points of contact.

Coming now to the practical test of the question, let us return to the facts. There were fearful crimes committed on the 21st and 22d of July. These are the undoubted subjects of judicial inquiry in the mode prescribed by law; to wit, through a grand jury. In that unknown and vast multitude of citizens and soldiers, who were guilty? Who were innocent? By the 22d section of the Declaration of Rights, it is declared that the "military shall in *all cases*, and *at all times*, be in *strict subordination* to the *civil* power." The military took many lives—the multitude some. Did the military act under the authority of the civil power? This is one of the first points of inquiry by a grand jury, for it involves the question, whether their acts were murder, manslaughter, excusable or justifiable homicide. Thus the evidence of civil authority becomes essential to the inquiry. Did the Governor, as commander-in-chief, command their presence, and aid in quelling the violence of the mob? Or was his authority assumed by unauthorized persons? These are questions which the Governor alone, as a witness, might be able to answer satisfactorily, by competent testimony in a common law proceeding. They are not state secrets, but acts of authority in their very nature public, and cannot be concealed from the inquiry of the law. The right of life and public safety are too sacred to be subordinated to any right to conceal the authority by which they are destroyed or jeoparded. If the executive authority was duly given, he neither can nor ought to withhold the knowledge which acquits of crime the military acting under his own orders. Indeed, from the character of our excellent Governor, he would not for a moment refuse to come to their rescue, if he believed his duty demanded it. On the other hand, if his authority was unlawfully assumed, or was simulated, or was exercised at the bidding of persons without right—an inference which his absence in California very naturally raises—and the military have been involved in an unlawful act, his duty and the rights of the people demand his testimony, that the parties who have thus misled them may be reached. This is no state secret as to them, but its concealment is a crime against society, which no one who knows the Governor would attribute to him, if aware of his duty.

At this point the case of Gray *v.* Pentland, 2 S. & R. 23, may be noticed. There the deposition sent to the Governor affecting Pentland's character was a privileged communication, and protected by the Governor's discretion, for otherwise he might be deprived of necessary information in the performance of official duty. Hence the court in an exercise of sound discretion would not compel its production. But, here, the authority of the Governor to call out

[Appeal of Hartranft et al.]

the troops to aid in suppressing a riot is in its nature a public act, and his testimony is necessary to vindicate their rights, or to reach others if unauthorized by him.   In every aspect of personal and official duty, the state has a right to the disclosure.   A contrary doctrine strikes at the essential and fundamental principles of a free government as set forth in the Declaration of Rights.

Analogies also prove the truth of the general doctrine, that no officer, high or low, is above the demands of justice, or above the process of the law.   For example, if the Governor's pardon, or other official acts be forged, or stolen, or procured by fraud or duress, is it possible he is not liable to be summoned before a jury, grand or petit, inquiring into the fact ?   His deposition cannot be taken in a criminal prosecution.   Indeed there is no difference between a civil and a criminal issue, for the power to subpœna him to give his deposition is just as essential.   So he is called to perform many acts of statutory duty.   Is he exempt from subpœna when any of these acts become the subject of judicial inquiry ?   And if by courtesy he be permitted to be excused, on what principle does this apply to his chief officers of state ?   The cases in Pennsylvania abundantly prove that a *mandamus* will lie to them to compel the performance of ministerial duties :  Griffith *v.* Cochran, 5 Binn. 87 ;  Commonwealth *v.* Cochran, 6 Id. 456;  Commonwealth *v.* Cochran, 1 S. & R. 473.   So the court will restrain by injunction :  Mott *v.* Pennsylvania Railroad Co., 5 Casey 33, 41.   Doubtless this court cannot interfere with the *discretion* of the Governor in the performance of any proper executive function, for in that his province is superior.   Argument is not needed to prove this, yet it is the great work of the opposite opinion, while no labor is bestowed to vindicate the power of the Governor to obstruct the punishment of crime, by a refusal to testify.   A subpœna to testify is not an interference with that discretion.   It has the force of a summons or notice, not an arrest.   This has been decided in two cases :  United States *v.* Cooper, 4 Dall. 341, and Respublica *v.* Duane, 4 Yeates 347.   In the former, Judge Chase said he knew of no privilege to exempt members of Congress from the service of a subpœna, though by the constitution they are exempt from *arrest* in all cases except treason, felony, and breach of the peace.   In the latter case, Judge YEATES, citing a similar provision in the constitution of the state, held that the service of a subpœna is not an arrest, and that the court may grant an attachment or not according to the existing circumstances.   These decisions bear directly on the question before us, for as to members of the assembly there is an express provision against arrest in all cases except treason, felony, breach and surety of the peace, and violation of their oath of office. Now the constitution makes no exemption whatever of the Governor, and he is brought directly within the maxim *expressio vel designatio personæ est exclusio alterius :*  Co. Litt. 210, a.   The decision in Respublica *v.* Duane, *supra*, is, therefore, strongly in point.   But

[Appeal of Hartranft *et al.*]

a case exactly in point, decided by that great judge and statesman, Chief Justice Marshall, is found in the trial of Aaron Burr for high treason : vol. 1, pp. 177 to 188. The following points were adjudged : 1. That a subpœna to the President of the United States can be issued. 2. That it can go with a clause of *duces tecum* to bring a letter in the possession of the President. 3. That it can be issued before indictment found. 4. That the refusal of the President is a subject for the exercise of the sound discretion of the court. On page 181 the chief justice, after stating that he is not aware of any decision that a subpœna cannot issue to the President, says that " it is not known ever to be doubted, that the chief magistrate of a state might be served with a subpœna *ad testificandum.*" A prominent feature of that case was that Col. Burr was prosecuted with intense earnestness, I might say bitterness, by the most eminent counsel in the United States (friends also of President Jefferson), who conceded the power to issue the subpœna. The same question arose again on the subsequent trial for a misdemeanor, and the same decision was made. Said Chief Justice Marshall : " That the President of the United States may be subpœnaed and examined as a witness, and required to produce any paper in his possession is not controverted :" Burr's Trial, vol. 2, 535. He then discusses the question of the propriety of compelling the production of the letter of General Wilkinson, stating some reasons very similar to those in our case of Gray *v.* Pentland, *supra,* for which a court would refuse compulsory process.

But assuming a case where the court would decline to compel the production of a paper or an answer to an oral question, it does not dispense with the Governor's attendance for examination, unless no other ground were alleged. But how does the governor know in advance what will be the subject of his examination ? *Non constat* that any question will be asked on a privileged matter. If such be asked, he can decline answering and refer the privilege to the court, which will decide it, just as it will the privilege of counsel, without requiring disclosure of the matter itself. Its nature is all the court need know.

Another point may be noticed. It is said the imprisonment of the Governor under the attachment would leave the state without a head. The case is hardly supposable, for when the Governor knows it is his duty to obey he will do so. Certainly Governor Hartranft is not a gentleman who would be guilty of a *voluntary* contempt. If *voluntarily* guilty, he would deserve attachment for the dereliction of the law, which his own oath requires him to see faithfully executed. Impeachment, which has been insisted upon, is a harsher remedy ; for the undeniable fact of his refusal to obey the process, would be the inevitable ground of removal from office. If, however, his disobedience be *involuntary* in consequence of pressing official duties, a court which would disallow his excuse would be visited

[Appeal of Hartranft et al.]

with the highest censure. But assuming a voluntary contempt and imprisonment still the position is untrue. The state is not without a head, for the 13th sect. of the 4th art. of the constitution provides : " in case of the death, conviction on impeachment, failure to qualify, resignation, or *other disability* of the Governor, the power, duties and emoluments of the office for the remainder of the term or *until the disability be removed*, shall devolve upon the Lieutenant-Governor." The 14th section provides for the disability of the Lieutenant-Governor, and devolves these duties on the Speaker of the Senate. It is said imprisonment is no disability, which is as much as to say the Governor may be in prison in Allegheny county and at the same time, at the seat of government, signing or vetoing bills or performing other duties. If no disability, then the state retains its head. But if the Governor be disabled from being in two places at the same time, then the disability brings the 13th sect. into play, and the state is provided with a constitutional substitute. *Quacunque via data*, there is a chief executive.

It is said the Governor is the representative of the people, and therefore not responsible. *This is true of executive duties*, for therein the constitution, the adopted will of the people, is his warrant of authority ; but it is untrue of judicial powers, for therein the judiciary represents the people, by the same warrant of authority ; and if he violate the law, which it is the province of the judiciary to enforce by their authority, he is liable to the law. In a government of law instituted by a free people for their own benefit, there is no royal prerogative to do nothing wrong ; and therefore there can be no representation of their dignity such as can strike down their law and prevent its administration by its appropriate functionary.

On no ground of the constitution, law, public justice, state policy, or sound reason, can I discover any exemption of any officer in the state, high or low, from the common duty all citizens owe to the due administration of justice. With these views, I cannot consent to rob the judiciary of its constitutional powers, and exalt the executive above the demands of justice and the safety and welfare of the people. I cannot abnegate a power intrusted to me by the people, and will return to them a commission, soon to expire, unsullied by any dereliction of duty, or obeisance at the shrine of unwarranted power.[1]

---

[1] NOTE.

C. J. AGNEW.—In my opinion I corrected the error of statement of counsel that there was no special charge to the grand jury committing to them the subject of the riots. Finding that the opinion of the court has followed the erroneous statement, I append hereto several paragraphs exhibiting the careful instruction of his Honor Judge Kirkpatrick, whose MSS. charge I have read, filling, on this particular subject, more than two columns of a newspaper closely printed in fine type, and containing the most special instructions on

[Appeal of Hartranft *et al.*]

the subjects of *strikes, conspiracy, arson, riotous arson, riot and riotous homicide.* It is but sheer justice to the judiciary and grand jury of Allegheny county that no such error should be perpetuated against them.

### EXTRACTS.

"*A class of cases and offences, however*, to which as yet I have made no allusion, *compel themselves upon our attention*, and which very recent events would seem to indicate, *will of necessity have to be passed upon and considered by you.* I allude, of course, to such cases as have their origin in and grow out of the recent riots and disturbances with which we are all, unfortunately, too painfully familiar. It is a matter of most unenviable notoriety that, on the occasion referred to, our always heretofore peaceable and law-abiding community was shocked and startled as by 'a fire bell at night,' by the fact that upon the streets of this peaceful and peace-loving city a great riot was in full progress, which, in the numbers of its participants, the wide-spread extent of their operations, and in the absolutely appalling nature and character of its apparent results, was calculated to strike terror into the very heart of our community. It seemed, indeed, for a time at least, on that not soon to be forgotten mid-summer Sabbath day, as if the very rankest communism of Paris had been let loose in our midst, and that the bloused *petroleuse* of the faubourg San Antoine and the heights of Mont-Martre were at their work, and plying their terrible vocation in the very streets of Pittsburgh. Surely there are no terms and no forms of speech or expression too broad by which to speak of and denominate such crimes, and no punishment too severe which can possibly await their clearly proven guilty perpetrators."

\*    \*    \*    \*    \*    \*    \*    \*    \*

"*Let me now call your attention to a still darker page in the history of this 'reign of terror;' and some of the crimes and consequences which followed from its brief existence.* I allude to the events transpiring about the Union depot, the round-houses, Twenty-eighth street and their adjacent neighborhood. In so calling it a 'reign of terror,' I speak advisedly and upon deliberation, for so to all who witnessed it, it certainly was. For if we had not with us in the flesh that triumvirate of infamy, Danton and Robespierre and Marat, we at least had them with us in spirit, brooding and hovering over our saturnalia of crime, and directing their most legitimate and bloody successors, whomsoever you may discover them to be, to destroy property, to commit pillage and riot, to light the incendiary's torch, and to cause (as did they in the highways and byways of Paris) the blood of innocent men and women, aye, and of children, too, to stain the stones and streets of this quiet and law-loving city."

\*    \*    \*    \*    \*    \*    \*    \*    \*

" 'This general duty, this universal obligation,' continues the same learned Judge King, from whom we have already quoted, 'extends to the *citizen soldiers,* who, in common with all other members of the community, are required to be assistant in the maintenance of the public peace on the call of the civil magistrate. They are subject to the same penalties in case of neglect or refusal to appear as any other citizen summoned by the sheriff. They do not on such occasions act in their technical character as military. *When assembled, they are but a part of the sheriff's posse, and act in subordination to and in aid of that officer,* who is the true and responsible chief of all forces summoned under his authority. If the soldiers act in any manner not authorized by law they are amenable for such acts, not to the military but the civil law. In brief, as to all rights and authorities they stand on the same footing with other citizens summoned by the sheriff, and compose, with them, his posse."