## Production of State Records in Court.

*Evidence—State records—Production in court—Authority of the executive departments—Public officers.*

1. Where officers of an executive department are subpœnaed to produce in court records of their department, they may judge in the first instance as to whether or not the production of such records would be inimical to the public interest, and, if they determine that it would, they may refuse to produce them.

2. This rule applies to the State Department of Health and the records of patients treated at State clinics or State sanatoria.

Attorney-General's Department. Opinion to Col. John D. McLean, Deputy Commissioner of Department of Health.

McNEES, Dep. Att'y-Gen., Jan. 29, 1923.—This office is·in receipt of your inquiry as to whether or not you are required to produce medical records of patients treated at State clinics or State sanatoria when subpœnaed so to do by a court of record in the State of Pennsylvania.

The question is a very broad and important one, as the principles applying to the records in your office will apply to other records on file in the various offices of the Commonwealth. Because of the broad application of this ruling we have given extensive study to your question.

The government of the State of Pennsylvania is vested in three distinct departments: the executive, the judicial, and the legislative. No one of these may encroach upon the prerogatives of another.

In the case before us we have an apparent conflict between the authority of the Judicial Department and that of the Executive Department. An officer of the Department of Health, which is a branch of the Executive Department of the government, does not want to present certain data, which he considers confidential and which were obtained purely in his official capacity, in a hearing before the court. The court desires such data and issues a subpœna directing the officer of the Department of Health to produce such records for the inspection of the court and for use as evidence in the case before it. We

need hardly say that were such records the personal property of a citizen or a corporation, it would be necessary to produce them. Where, however, they are procured by an official of the Commonwealth in his official capacity, a grave question arises.

In 1815, in the case of Gray *v.* Pentland, 2 S. & R. 23, certain public records were involved. The case was a suit for libel alleged to have been published by Gray by way of a deposition before a justice of the peace. This deposition was then forwarded to the Governor of the Commonwealth, and was apparently the only evidence of the libel. The law would not permit the plaintiff to introduce oral testimony concerning this libel so long as the written document was in evidence, and the Governor refused to deliver the document to the court, so that the plaintiff was seriously handicapped in the presentation of his case. The court held, however, that even though it was apparently very unfair to the plaintiff to reject his oral testimony, it could not be accepted, Justice Yeates commenting thereon as follows: "But hard as such a case confessedly is, the streams of justice. must flow in their accustomed channels. The rules of evidence, founded in good sense and the experience of mankind, must be adhered to. The law abhors parol evidence of the contents of written instruments, and considers it as highly dangerous. . . . Here, it is admitted that the libelous paper, which is the foundation of one of the counts in the declaration, exists on the files of the chief magistrate, although it has not been in the power of the defendant in error to produce it on the trial. . . ."

Justice Brackenridge, in the same case, says: "As to the Governor, in this case, being compellable to give the deposition or writing transmitted to him, I incline to think it cannot be done. It must be a matter within his discretion, to furnish or to refuse it, and this on ground of public policy. . . ."

Chief Justice Tilghman also expressed his opinion on this point in the same case in the following language: ". . . It would seem reasonable, therefore, that the Governor, who best knows the circumstances under which the charge has been exhibited to him, and can best judge of the motives of the accuser, should exercise his own judgment with respect to the propriety of producing the writing. It is not to be presumed that he would protect a wanton and malicious libeler. And even if he should, it is better that a few of the guilty should escape than a precedent be established by which many innocent persons may be involved in trouble. . . ."

This precedent, unreversed, seems to substantiate the general principle that information secured by the Chief Executive of the Commonwealth in his official capacity may or may not be divulged by him in the courts of the Commonwealth as his own judgment may dictate.

This question was again apparently fairly raised in the case of Hartranft's Appeal, 85 Pa. 433. In that case there was an attempt to attach certain officers of the State government who refused to appear and testify. While there was, perhaps, a fatal irregularity in the subpœna, yet, for the purpose of deciding the main question at issue, this irregularity was waived. Mr. Justice Gordon, in his opinion in this case, sets forth the following principles: "For the purposes of this case, however, we may admit the regularity of this subpœna, and that upon an ordinary citizen it would have been binding and obligatory, for we regard the question of the liability of the appellants to attachment, in any event, as the prime one of this case. In order to resolve this, we must first understand who the persons are against whom the court has directed its attachment and for what purpose they have been subpœnaed. They are the Governor of Pennsylvania, the Secretary of the Commonwealth,

2 D. & C.

the Adjutant-General, chief officers of the Executive Department of the State government, and two officers of the National Guard; the latter subordinates acting under the orders of the former. . . . It will be observed that these persons are subpœnaed for the purpose of compelling a revelation of such things as have come to their knowledge in their official capacities, and which strictly belong to their several departments as officers of the Commonwealth. This is clearly set out in the answer by the Attorney-General to the application for the attachment, and there has been no denial thereof upon the argument before us. In order to simplify matters, we may treat this case just as though the process, first and last, were against the Governor alone; for if he is exempt from attachment because of his privilege, his immunity protects his subordinates and agents. The general principle is, that whenever the law vests any person with the power to do an act, at the same time constituting him a judge of the evidence on which the act may be done, and contemplating the employment of agents through whom the act is to be accomplished, such person is clothed with discretionary powers, and is *quoad hoc* a judge. . . ."

There remains for consideration, perhaps, only the question as to what would happen were we to find the law to be that the Governor or his subordinates must answer to subpœnas issued in the various courts of the Commonwealth. Suppose a subpœna were issued to the Governor of Pennsylvania to appear in the courts of Erie County, regardless of the inconvenience to the public business in Harrisburg or of the time it might take from his official duties, and he is bound to obey such subpœna. He would thereupon become liable to obey subpœnas issued in any county of the Commonwealth at any time. If he were so liable and did not appear, an attachment could issue and he would be forcibly brought into court or detained in prison. We need pursue this course no further. It would be a vain thing to say that such subpœnas must be obeyed, but that there is no method of enforcing obedience.

The proper interpretation of the law and the Constitution in this case appears to be that the Governor, and, through him, his executive subordinates, shall be the judges of whether or not communications which courts desire to have presented to them under subpœna are such as should be considered private records, and are such as it would be against the public policy of the State to disclose. Having once determined this, he should thereupon produce the records in obedience to the subpœna or refuse to produce them in the exercise of his executive prerogatives.

". . . In other words, if, from such analogy, we once begin to shift the supreme executive power from him upon whom the Constitution has conferred it to the judiciary, we may as well do the work thoroughly and constitute the courts the absolute guardians and directors of all governmental functions whatever. If, however, this cannot be done, we had better not take the first step in that direction. We had better, at the outstart, recognize the fact that the executive department is a co-ordinate branch of the government, with power to judge what should or should not be done within its own department, and what of its own doings and communications should or should not be kept secret, and that with it, in the exercise of these constitutional powers, the courts have no more right to interfere than has the executive, under like conditions, to interfere with the courts: . . ." Hartranft's Appeal, 85 Pa. 433, 445.

"Again, the Governor, having a proper regard for the dignity and welfare of the people of the Commonwealth, is not likely to submit himself to imprisonment, on the decree of the Court of Quarter Sessions, or to permit his

officers and coadjutors to be thus imprisoned. Were we, then, to permit the attempt to enforce this attachment, an unseemly conflict must result between the executive and judicial departments of the government. We need not say that prudence would dictate the avoidance of a catastrophe such as here indicated: . . ." Hartranft's Appeal, 85 Pa. 433, 446.

In the case of Thompson *v.* The German Valley R. R. Co., 22 N. J. Eq. 111, the Governor refused to obey a subpœna *duces tecum* on the ground that his duty required him not to appear or produce the paper required, nor to submit his official acts, as Governor, to the scrutiny of any court. The text-books generally state the law to be that the President of the United States, the governors of the several states and their cabinet officers are not bound to produce papers nor to disclose information committed to them in a judicial inquiry when, in their judgment, the disclosure would, on public grounds, be inexpedient.

In Hartranft's Appeal, 85 Pa. 433, Justice Gordon further says: "Thus, the question of the expediency or inexpediency of the production of the required evidence is referred, not to the judgment of the court before which the action is trying, but of the officer who has that evidence in his possession. The doctrine that the officer must appear and submit the required information or papers to the court for its judgment as to whether they are or are not proper matters for revelation is successfully met and settled in the case of Beatson *v.* Skene, 5 Hurlst. & N. 838, per Pollock, C. B. It was there held that if the production of a state paper would be injurious to the public interest, the public welfare must be preferred to that of the private suitor. The question then arose, how was this to be determined? It must be determined either by the judge or by the responsible crown officer who has the paper. But the judge could come to no conclusion without ascertaining what the document was or why its publication would be injurious to the public service. Just here, however, occurred this difficulty, that, as judicial inquiry must always be public, the preliminary examination must give to the document that very publicity which it might be important to prevent. The conclusion reached was that from necessity, if for no other reason, the question must be left to the judgment of the officer."

In the famous trial of Aaron Burr, the President of the United States refused to appear before the judges and produce a certain letter alleged to have been written by General Wilkinson. The courts there held that the President, without assigning any reason whatever for withholding the paper, might decide on his own authority whether or not he should do so. Of the weight of the reasons for and against producing it, he himself was the judge.

I am of the opinion, therefore, and so advise you, that where officers of your department, being a branch of the executive authority of the State government, are subpœnaed to appear and bring with them certain confidential records procured solely in their official capacity, you shall judge, in the first instance, whether or not the production of such records would be inimical to the public welfare; that, having so determined, you shall act accordingly, and that if, in your judgment, such records should not be produced, you should make respectful presentation to the court of your opinion in the matter, expressly disavowing any disrespect for the dignity and authority of said court, but setting forth your conviction that you must determine, in the first instance, from your knowledge of the records, whether or not they are such as should be made public.

From Guy H. Davies, Harrisburg, Pa.