# Assertion of Executive Privilege by the Chairman of the Atomic Energy Commission

Questions put to the Chairman of the Atomic Energy Commission regarding conversations he may have had with the President or his assistants in the White House come within the scope of the executive privilege, whereby information, papers, and communications which the President or the heads of the executive departments or agencies deem confidential in the public interest need not be disclosed to a congressional committee. In addition, the questions are within the scope of the President's letter of May 17, 1954 to the Secretary of Defense setting forth the Administration's policy that, in the public interest, advisement on official matters between employees of the Executive Branch of the government be kept confidential, and any conversations, communications, documents or reproductions concerning such advisement not be disclosed in congressional hearings.

Even if it were conceded only for the purpose of argument that the Atomic Energy Commission is a typical independent regulatory commission, which is not in one branch of the government to the exclusion of others but straddles at least two branches so as to be part of each, there is historical precedent indicating that, as to the executive functions of such a commission, its officers and employees have a right, and, when directed by the President, a duty to invoke the executive privilege.

The so-called fraud exception to executive privilege does not exist. The precedent for the so-called exception really evidences the unlimited discretion of the President to determine whether the public interest requires that the executive privilege be invoked or waived in a particular case.

January 5, 1956

MEMORANDUM FOR THE ASSISTANT ATTORNEY GENERAL
OFFICE OF LEGAL COUNSEL

The Honorable Lewis L. Strauss, Chairman, Atomic Energy Commission, in a letter to the Attorney General dated December 7, 1955, states that at a hearing on December 5, 1955 before the Antitrust and Monopoly Subcommittee of the Senate Judiciary Committee regarding the Mississippi Valley Generating Company contract, he was asked to testify "as to conversations or discussions I may have had with the President or his Assistants in the White House with respect to the negotiation of the contract, the decision to bring the contract to an end, and the action by the Commission, on advice of its General Counsel, that the contract should not be recognized as a valid obligation of the Government on the ground of possible conflicts of interest." Chairman Strauss reports that he declined to answer the above inquiry on the basis of the executive privilege under the constitutional doctrine of separation of powers.

It is the conclusion of this memorandum that the questions set forth in Chairman Strauss's letter come within the scope of the executive privilege, whereby information, papers, and communications which the President or the heads of the executive departments or agencies deem confidential in the public interest need not be disclosed to a congressional committee. It is the further conclusion of this memorandum that the questions are within the scope of the President's letter of

May 17, 1954 to the Secretary of Defense, setting forth the Administration's policy that, in the public interest, advisement on official matters between employees of the Executive Branch of the government is to be kept confidential, and any conversations, communications, documents, or reproductions concerning such advisement is not to be disclosed in congressional hearings. The President's letter to the Secretary of Defense states in part:

> Within this Constitutional framework each branch should cooperate fully with each other for the common good. However, throughout our history the President has withheld information whenever he found that what was sought was confidential or its disclosure would be incompatible with the public interest or jeopardize the safety of the Nation.

> Because it is essential to efficient and effective administration that employees of the Executive Branch be in a position to be completely candid in advising with each other on official matters, and because it is not in the public interest that any of their conversations or communications, or any documents or reproductions, concerning such advice be disclosed, you will instruct employees or your Department that in all of their appearances before the Subcommittee of the Senate Committee on Government Operations regarding the inquiry now before it they are not to testify to any such conversations or communications or to produce any such documents or reproductions. This principle must be maintained regardless of who would be benefited by such disclosures.

100 Cong. Rec. 6621 (1954); Letter to the Secretary of Defense Directing Him to Withhold Certain Information from the Senate Committee on Government Operations, *Pub. Papers of Pres. Dwight D. Eisenhower* 483, 483–84 (May 17, 1954).

## I.

The President's letter to the Secretary of Defense is based on the constitutional doctrine of separation of powers. Article II, Section 1 of the Constitution states that "[t]he executive Power shall be vested in a President of the United States of America." Article II, Section 3 provides that the President "shall take care that the Laws be faithfully executed." And the President's oath of office requires that he "faithfully execute the Office of President of the United States," and to the best of his ability, "preserve, protect and defend the Constitution of the United States." U.S. Const. art. II, § 1. Attorney General Cushing, in discussing the application of the constitutional doctrine of separation of powers in order to determine the

legality of separate resolutions of the Senate and House of Representatives requiring the Secretary of the Interior to pay a certain claim, succinctly set forth the relationship between the Legislative and Executive Branches of the government, and the relationship between executive officials and of the government, and the relationship between executive officials and the President. It was stated in *Resolutions of Congress*, 6 Op. Att'y Gen. 680 (1854), that:

> The act of a Head of Department is, in effect, an act of the President. Now, the Constitution provides for co-ordinate powers acting in different and respective spheres of co-operation. The executive power is vested in the President, whilst all legislative powers are vested in Congress. It is for Congress to pass laws; but it cannot pass any law, which, in effect, coerces the discretion of the President, except with his approbation, unless by concurrent vote of two-thirds of both Houses, upon his previous refusal to sign a bill. And the Constitution expressly provides that orders and resolutions, and other votes of the two Houses, in order to have the effect of law, shall, in like manner, be presented to the President for his approval, and if not approved by him shall become law only by subsequent concurrence in vote of two-thirds of the Senate and House of Representatives.

> If, then, the President approves a law, which imperatively commands a thing to be done, ministerially, by a Head of Department, his approbation of the law, or its repassage after a veto, gives constitutionality to what would otherwise be the usurpation of executive power on the part of Congress.

> In a word, the authority of each Head of Department is a parcel of the executive power of the President. To coerce the Head of Department is to coerce the President. This can be accomplished in no other way than by a law, constitutional in its nature, enacted in accordance with the forms of the Constitution.

*Id.* at 682–83. It should be noted that Attorney General Cushing concludes in the above quotation that Congress can coerce the action of an executive officer only by a law which is constitutional in its nature and operation and enacted in accordance with the procedures provided for by the Constitution. There is no law of the United States requiring the disclosure of information pertaining to the executive function of the government of the United States when the President has, in his discretion, determined that such information should not be disclosed in the public interest. The enactment of such a law would, of course, raise a serious question of unconstitutional invasion by Congress of the powers of the Executive.

The right of the Executive Branch to withhold from congressional committees information which the President or the head of an executive department or agency thinks should be withheld for the public interest is a principle which was recognized and utilized by President Washington. For over 150 years since the establishment of our constitutional form of government, the Presidents have successively established, by precedent, that they, and members of their cabinet and other heads of executive departments and agencies, have a privilege and discretion to keep confidential, in the public interest, papers and information which require secrecy. These precedents are set forth in (1) an article by Herman Wolkinson, *Demands of Congressional Committees for Executive Papers*, 10 Fed. B.J. 103 (1948–49), (2) a memorandum prepared for the Department of Justice by Mr. Wolkinson, and (3) a May 17, 1954 memorandum to the President from the Attorney General, 100 Cong. Rec. 6621–23 (1954). Most of the precedents involve refusals by the President, cabinet officers, or officials of executive departments, acting pursuant to directions of the President or heads of departments. A few of the recent precedents involve the independent regulatory commissions.

There have been a number of judicial decisions, both in the Supreme Court and lower courts, establishing the rule that information and papers which the President and heads of executive departments consider confidential, in the public interest, need not be produced in court. These cases also hold that the decision as to whether the information is confidential is entirely within the discretion of the Executive. An excellent summary of the reasons which prevent disclosure of confidential information by the executive departments, both to the Judicial Branch and to the Legislative Branch, is contained in a well-documented speech of Senator Jackson (who became a justice of the Supreme Court in 1893), in the controversy which Cleveland's administration had with the Senate over the refusal to disclose confidential information. Senator Jackson stated:

> Sir, has this body, has the Congress of the United States any more authority over papers in the Executive Departments of this Government than the co-ordinate independent branch of the Government— the judiciary? The judicial department of this Government has as much power and authority over all papers in the hands of the Executive or in any Department as the entire Congress has. When the rights of individuals, affecting their life, liberty, or property, are pending before the courts, the judicial department has as much power over papers as the Senate or the whole Congress; and yet it has been universally recognized from the very foundation of this Government that the judicial department of the Government can not call for papers and procure them either from the President or the head of an Executive department at its own will, but that the discretion rests with the Executive and with the Departments how far and to what extend they will produce those pape[r]s.

17 Cong. Rec. 2623 (Mar. 22, 1886).

In the famous case of *Marbury v. Madison*, 5 U.S. (1 Cranch) 137 (1803), Chief Justice Marshall was presented with the problem of defining the limits at which the judiciary must stop when the head of an executive department invokes the privilege that the information sought from him is confidential information and therefore cannot be disclosed. The rule of law was stated by the Supreme Court as follows:

> By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience. To aid him in the performance of these duties, he is authorized to appoint certain officers, who act by his authority and in conformity with his orders.

> In such cases, their acts are his act; and whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion. The subjects are political. They respect the nation, not individual rights, and being entrusted to the executive, the decision of the executive is conclusive. The application of this remark will be perceived by adverting to the act of congress for establishing the department of foreign affairs. This officer, as his duties were prescribed by that act, is to conform precisely to the will of the President. He is the mere organ by whom that will is communicated. The acts of such an officer, as an officer, can never be examinable by the courts.

> But when the legislature proceeds to impose on that officer other duties; when he is directed peremptorily to perform certain acts; when the rights of individuals are dependent on the performance of those acts; he is so far the officer of the law; is amenable to the laws for his conduct; and cannot at his discretion sport away the vested rights of others.

*Id.* at 165–66. An examination of the facts surrounding the Mississippi Valley Generating Company matter clearly indicates that the conversations, if any, of the officials of the Atomic Energy Commission with the President and his White House assistants come within the category of those matters which Marshall termed "political" and concerning which the Executive has complete discretion as to whether such matters should be examined by the courts.

In regard to the intimate relationship between the President and his heads of departments, Marshall said:

> The intimate political relation subsisting between the president of the United States and the heads of departments, necessarily renders any legal investigation of the acts of one of those high officers peculiarly irksome, as well as delicate; and excites some hesitation with respect to the propriety of entering into such investigation. Impressions are often received without much reflection or examination and it is not wonderful, that in such a case as this, the assertion, by an individual, of his legal claims in a court of justice[,] to which claims it is the duty of that court to attend[,] should at first view be considered by some, as an attempt to intrude into the cabinet, and to intermeddle with the prerogatives of the executive.

> It is scarcely necessary for the court to disclaim all pretensions to such a jurisdiction. An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is, solely, to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have a discretion. Questions in their nature political, or which are, by the constitution and laws, submitted to the executive, can never be made in this court.

*Id.* at 169.

Other decisions and trials in which the executive privilege to withhold confidential information from disclosure in a court was either recognized or successfully asserted are *United States v. Smith*, 27 F. Cas. 1192 (C.C.N.Y. 1806) (No. 16,342); *Mississippi v. Johnson*, 71 U.S. 475 (1866); *Totten v. United States,* 92 U.S. 105 (1875); *Appeal of Hartranft*, 85 Pa. 433 (1877); Trial of Thomas Cooper, for a Seditious Libel, in the Circuit Court of the United States for the Pennsylvania District (Philadelphia, 1800), *in* Francis Wharton, *State Trials of the United States During the Administrations of Washington and Adams* 659 (1849); 1 David Robertson, *Reports of the Trials of Colonel Aaron Burr* (1808). In the case of *Myers v. United States*, 272 U.S. 52 (1926), Chief Justice Taft, in analyzing the relationship between the President and the heads of executive departments, said in the majority opinion:

> This field is a very large one. It is sometimes described as political. . . . Each head of a department is and must be the President's alter ego in the matters of that department where the President is required by law to exercise authority.

*Id.* at 132–33. It should be noted that there are no judicial precedents as to the existence or extent of the executive privilege in the area of congressional investigation. However, it is submitted that Senator Jackson's argument, set forth above,

to the effect that the executive privilege in a congressional inquiry is just as great, if not greater, than is the scope of the privilege in the courts, is a correct analysis of the law.

There are a number of opinions of the Attorney General which deal with the existence and extent of the executive privilege in the case of judicial and congressional inquiry. Attorney General Speed stated the principle to President Lincoln:

> Upon principles of public policy there are some kinds of evidence which the law excludes or dispenses with. Secrets of state, for instance, cannot be given in evidence, and those who are possessed of such secrets are not required to make disclosure of them. The official transactions between the heads of departments of the Government and their subordinate officers are, in general, treated as "privileged communications." The President of the United States, the heads of the great departments of the Government, and the Governors of the several States, it has been decided, are not bound to produce papers or disclose information communicated to them where, in their own judgment, the disclosure would, on public considerations, be inexpedient. These are familiar rules laid down by every author on the law of evidence.

*Records of Courts-Martial*, 11 Op. Att'y Gen. 137, 142–43 (1865). Other opinions dealing with the executive privilege in a court are to be found at *Civil Service Commission—Production of Records*, 20 Op. Att'y Gen. 557, 557–58 (1893); *Executive Department—Official Records—Testimony*, 25 Op. Att'y Gen. 326 (1905).

In President Theodore Roosevelt's administration, Attorney General Bonaparte stated that the head of the Bureau of Corporations was not obliged to deliver papers to a Senate committee, pursuant to a subpoena served upon him. Instead, the Attorney General counseled the head of the Bureau to deliver the records to President Roosevelt, who had the authority to determine the propriety of making public the information sought by the Senate. *Commissioner of Corporations— Right of Senate Committee to Ask for Information*, 27 Op. Att'y Gen. 150, 156 (1909). President Theodore Roosevelt decided that the Senate was not to see the papers, wrote a letter telling them so, and challenged the Senate to impeach him to get them. *The Letters of Archie Butt: Personal Aide to President Roosevelt* 305–06 (Lawrence F. Abbott ed., 1924); Edward S. Corwin, *The President: Office and Powers* 281, 428 n.45 (1st ed. 1940).

During President Franklin D. Roosevelt's administration, Attorney General Jackson, in a letter to Representative Carl Vinson, Chairman, House Committee on Naval Affairs, set forth the Justice Department's policy that all investigative reports are confidential documents of the executive department and that congressional access thereto was not in the public interest. The executive and legal

precedents behind the theory of executive privilege were set forth in some detail in the letter which is published in *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45 (1941).

A large number of eminent legal scholars and text writers have expressed the opinion that an executive privilege of secrecy exists as to confidential official documents, and for communications between government officials. *See* 8 *Wigmore on Evidence* § 2378(3) (3d ed. 1940); Edward Campbell Mason, *Congressional Demands Upon the Executive for Information*, *in* 5 *Papers of the American Historical Association* 367 (1891); John Philip Hill, *The Federal Executive* 55–56 (1916); 3 Westel Woodbury Willoughby, *The Constitutional Law of the United States* § 968, at 1488–91 (2d ed. 1929); John H. Finley & John F. Sanderson, *The American Executive and Executive Methods* 199–200, 264–65 (1908); Herman Finer, *Questions to the Cabinet in the British House of Commons: Their Applicability to the United States Congress*, *in* Staff of Joint Comm. on the Organization of Congress, 79th Cong., *The Organization of Congress: Suggestions for Strengthening Congress by Members of Congress and Others* 49, 56–57 (Comm. Print 1946); Ernest J. Eberling, *Congressional Investigations* 282 (1928).

Edward S. Corwin, in *The President: Office and Powers*, recognizes in the first edition of his book (1940) the existence of an executive privilege in the field of congressional investigations. However, the author states that, should a cabinet officer fail to respond to the subpoena of congressional committee, he saw no reason why Congress could not hold the officer in contempt. *Id.* at 281–82. In the third edition of his book (1948), Mr. Corwin leaves out the above observation and deals only with the precedents indicating the existence of an executive privilege in the field of congressional inquiry for not only the President, but cabinet officers and executive officers and employees when they act pursuant to the direction of the President or heads of departments in refusing to disclose confidential executive information. *Id.* at 136–43.

Philip R. Collins, in an article entitled *The Power of Congressional Committees of Investigation to Obtain Information from the Executive Branch: The Argument for the Legislative Branch*, 39 Geo. L.J. 563 (1950–51), presents an argument against the existence of an executive privilege, particularly for cabinet officers and executive employees when called as witnesses before congressional committees. The argument is based mainly on the congressional debates during Cleveland's and Truman's administrations, when the Executive was at logger-head with a Republican Congress. In both cases, much was said, but nothing was done by Congress.

At the request of Senator Langer, the Legislative Reference Service of the Library of Congress prepared a study entitled *Congressional Power of Investigation*, S. Doc. No. 83-99 (1954). On pages 20–27 the analysis deals with the question of investigation of the Executive Branch. The conclusion reached is that there is no categorical answer to the question how far Congress can go in requiring

information from the Executive Branch. It is recognized that the only precedents are historical ones.

## II.

An argument may be made by the Senate subcommittee to the effect that the executive privilege and direction concerning the privilege in the President's letter of May 17, 1954, to the Secretary of Defense, apply only to the executive departments of the government and not to the independent regulatory commissions. An examination of the historical precedents and the President's letter concerning the exercises of the executive privilege clearly indicate that the precedents and letter apply to the entire Executive Branch and function of the government, and not alone to the ten executive departments. It should be noted that irrespective of a determination of the problem of the precise position of the Atomic Energy Commission within the framework of the federal government, it is clear that the Mississippi Valley Generating Company contract, with which the inquiry in question is concerned, was negotiated, cancelled and rescinded by the Atomic Energy Commission as an exercise of the executive function of government.

An examination of the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011–2281 (1952 Supp. II), indicates that the Atomic Energy Commission is an independent establishment of the government, in the sense that it is outside the ten executive departments, and is not subject to direct supervision or control by any Cabinet Secretary. An examination of the Act also indicates that the Commission primarily exercises a non-regulatory executive function, and only incidentally thereto, any regulatory power. The principal functions of the Atomic Energy Commission, as set forth in the Atomic Energy Act of 1954, 42 U.S.C. § 2013, are (1) the conducting, assisting, and fostering of research and development in order to encourage the maximum scientific and industrial progress in the field of atomic energy; (2) the formulation of a program for the dissemination of unclassified scientific and technical information, and the control, dissemination and declassification of restricted data, subject to appropriate safeguards, so as to encourage scientific and industrial progress in the field of atomic energy; (3) the conducting of a program of government control of the possession, use, and production of atomic energy and special nuclear material so as to make the maximum contribution to the common defense and welfare of the nation; (4) the development of a program to encourage widespread participation in the development and utilization of atomic energy for peaceful purposes to the maximum extent consistent with the common defense and the health and safety of the public; (5) the conducting of a program of international cooperation to promote the common defense and security of the nation, and to make available to cooperating nations the benefits of the peaceful application of atomic energy; and (6) the administration of a program to carry out the above

policies, and to keep Congress currently informed so that it may take such further legislative action as may be necessary.

In carrying out the above functions, which are executive in nature, the Atomic Energy Commission has been given, by Congress, the power to regulate the production and use of atomic energy for commercial and medical purposes through a system of licenses issued pursuant to rules and regulations of the Commission. The Commission is also authorized to conduct hearings, make findings, and regulate the patent licensing of inventions or discoveries useful in the peaceful production and utilization of atomic energy. Such regulatory powers as the Commission has are incidental to the exercise by the Commission of its executive function of operating for the federal government a monopoly of the production and use of atomic energy. In this way, the Atomic Energy Commission differs basically from such regulatory commissions as the Interstate Commerce Commission, Securities and Exchange Commission, Federal Trade Commission, etc., which are agencies that exercise governmental control primarily by way of quasi-legislative or quasi-judicial procedures over otherwise federally uncontrolled private business affairs or property interests.

From an analysis of its functions, the Atomic Energy Commission appears to be an establishment, within the Executive Branch of the government which has been given quasi-legislative and quasi-judicial powers to be used incidentally in carrying out its principal executive functions. The granting of quasi-legislative or quasi-judicial powers to a governmental establishment which is primarily executive in nature is by no means novel. One example is the Secretary of Agriculture who, though clearly an executive officer within the Executive Branch of the government, has under the Packers and Stockyards Act, 7 U.S.C. §§ 181–231 (1952), been given quasi-legislative and quasi-judicial powers by Congress. Another excellent example is that of the Tennessee Valley Authority ("TVA"). In the case of *Morgan v. TVA*, 115 F.2d 990 (6th Cir. 1940), the issue concerned the power of the President to remove an officer of the TVA. In the case of *Myers v. United States*, 272 U.S. 52 (1926), the Supreme Court held that the President's removal powers were unrestrictable as to purely executive officers. However, in the case of *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), the Supreme Court decided that in the case of an agency such as the Federal Trade Commission, which the court held exercised primarily quasi-legislative and quasi-judicial powers and only incidentally thereto any executive function, Congress could constitutionally limit the President's removal powers. Therefore, to determine the issue in the *Morgan* case the Sixth Circuit had to determine what the position of the TVA was in the framework of the federal government. The court stated:

> It requires little to demonstrate that the Tennessee Valley Authority
> exercises predominantly an executive or administrative function. To

it has been entrusted the carrying out of the dictates of the statute to construct dams, generate electricity, manage and develop government property. Many of these activities, prior to the setting up of the T.V.A., have rested with the several divisions of the executive branch of the government. True, it is, that in executing these administrative functions, the Board of Directors is obliged to enact by-laws, which is a legislative function, and to make decisions, which is an exercise of function judicial in character. In this respect its duties are, in no wise, different, except perhaps in degree, from the duties of any other administrative officers or agencies, or the duties of any other Board of Directors, either private or public. Whatever their character, they are but incidental to the carrying out of a great administrative project. The Board does not sit in judgment upon private controversies, or controversies between private citizens and the government, and there is no judicial review of its decisions, except as it may sue or be sued as may other corporations. It is not to be aligned with the Federal Trade Commission, the Interstate Commerce Commission, or other administrative bodies mainly exercising clearly quasi-legislative or quasi-judicial functions—it is predominantly an administrative arm of the executive department. The rule of the Humphrey case does not apply.

115 F.2d at 993–94. The court held that the doctrine of the *Myers* case applied, and that the President had unrestricted power to remove the officers of the TVA. It is submitted that the position of the Atomic Energy Commission within the framework of the federal government is closely analogous to that of the Tennessee Valley Authority.

It is clear, therefore, that the executive privilege and direction concerning said privilege, which was the subject of the President's letter of May 17, 1954 to the Secretary of Defense, apply to the questions which Chairman Strauss has referred to in his letter to the Attorney General because first the questions clearly involve the carrying out of the executive function by Chairman Strauss, and second because the officers of the Atomic Energy Commission, due to the nature of the Commission's functions, are officers of a governmental establishment within the Executive Branch of the government, and as such are subject to the President's direction concerning the exercise of the executive privilege.

However, even if it were conceded only for the purpose of argument that the Atomic Energy Commission is a typical independent regulatory commission, which is not in one branch of the government to the exclusion of others but straddles at least two branches so as to be part of each, there is historical precedent indicating that, as to the executive functions of such a commission, its officers and employees have a right, and, when directed by the President, a duty to invoke the

executive privilege. Such an historical precedent has been established in connection with a congressional investigation of the Federal Communications Commission. On January 19, 1943, the House of Representatives appointed a Select Committee to Investigate the Federal Communications Commission. The committee was authorized to require by subpoena the attendance of witnesses and the production of books and papers. James L. Fly, Chairman of the Federal Communications Commission and Chairman of the Board of War Communications, was subpoenaed as a witness to appear before the aforesaid committee. Mr. Fly appeared on July 9, 1943, but did not produce the records described in the subpoena. He told the committee that he was bound by the decision of the Board of War Communications, of which he was chairman, not to divulge the records in question; and that even if he had the documents in his custody, he would have no choice but to decline to hand them over to the committee. The records in question were in the possession of Mr. Denny, General Counsel of the Federal Communications Commission, who was present at the time Mr. Fly was testifying before the committee. Mr. Denny had also been subpoenaed. He advised the committee that he had possession of the papers called for. Neither Mr. Denny nor Mr. Fly exhibited the records to the committee. Both felt bound by the decision of the Board of War Communications. *Study and Investigation of the Federal Communications Commission: Hearings Before the Select H. Comm. to Investigate the Federal Communications Commission*, 78th Cong., pt. 1, at 46–67 (1943). It is submitted that the above rule and precedent have a firm legal basis in the constitutional doctrine of separation of powers and in the constitutional provisions that all executive power is vested in the President of the United States, and that the President shall take care that the laws be faithfully executed.

It may also be argued by the subcommittee that Congress occupies a special statutory position in relation to the Atomic Energy Commission, and that such relationship requires a disclosure by Chairman Strauss of the conversations in question. Title 42, section 2252 of the U.S. Code provides in part that:

> The Commission shall keep the Joint Committee fully and currently informed with respect to all of the Commission's activities. The Department of Defense shall keep the Joint Committee fully and currently informed with respect to all matters within the Department of Defense relating to the development, utilization, or application of atomic energy. Any Government agency shall furnish any information requested by the Joint Committee with respect to the activities or responsibilities of that agency in the field of atomic energy.

First of all, it should be noted that the above provisions relate to the Joint Committee of Congress on Atomic Energy and not the Antitrust and Monopoly Subcommittee of the Senate Judiciary Committee, which is the subcommittee that has made the inquiry in question. Second, and most important, from a reading of

42 U.S.C. § 2252 and an examination of the legislative history of the Atomic Energy Act of 1946, and the Atomic Energy Act of 1954, it appears that section 2252 requires the Commission to keep the Joint Committee advised of all the Commission's activities but not of each commissioner's individual activity in the line of official duty. In the committee report to the House of Representatives, H.R. Rep. No. 83-2181 (1954), which was submitted at the time the Atomic Energy Act of 1954 was considered by the House, it is stated that:

> The Commission and the Department of Defense are required to keep the joint committee fully and currently informed with respect to all atomic-energy matters. It is the intent of Congress that the joint committee be informed while matters are pending, rather than after action has been taken.

*Id.* at 29. The 1954 Act, as finally enacted, amended section 15 of the 1946 Act, 42 U.S.C. § 1815 (1952), by inserting the word "all" in the provision requiring the Commission to keep the Joint Committee advised of all the Commission's activities. The 1954 Act also included, for the first time, a similar provision in regard to the Department of Defense, and a requirement that all government agencies furnish to the Joint Committee, when requested, information concerning the agency's activities or responsibilities in the field of atomic energy.

Section 2252 appears to require the Commission to keep the Joint Committee currently advised of the action which the Commission, as a body, is taking in regard to atomic energy matters, but not of the conversations between the various commissioners, between the commissioners and the employees of the Atomic Energy Commission, or between the President or his officers and advisors, which may or may not lead to final collective action by the Commission itself. In other words, the section applies only to the action of the Commission as a collective body, and not to individual action by the commissioners. Such a position is further strengthened by the fact that section 2252 also requires the Defense Department, which is clearly within the Executive Branch, to keep the Joint Committee fully and currently informed with respect to all matters within that department relating to the development, utilization, or application of atomic energy. It is submitted that, if Congress were to require the Atomic Energy Commission or the Department of Defense to keep Congress or a committee thereof advised of those matters, which it is here asserted Congress has not required under section 2252 (particularly in regard to conferences with the President, or his personal advisors or cabinet officers), there would be presented a serious question whether Congress had exceeded the limit of its constitutional right to investigate the Executive Branch of the government for the purpose of aiding further legislation. In effect, such a sweeping congressional requirement of disclosure of normally confidential information from within the Executive Branch of the government might amount to an unconstitutional exercise of the executive power by Congress, and a usurpation

by Congress of the Executive's exclusive constitutional duty to take care that the laws are faithfully executed. This would be particularly true if, as previously pointed out, Congress should, by section 2252, attempt to coerce the disclosure from within the Executive Branch of information which the President has held to be confidential in the public interest. However, pursuant to the interpretation of section 2252 as set forth in this memorandum, there is presented no constitutional problem, and it is clear that the section does not curtail the right to invoke the executive privilege or affect the direction in the President's letter of May 17, 1954, that the executive privilege is to be asserted when Congress makes an inquiry in the nature of the questions reported by Chairman Strauss in his letter to the Attorney General.

It should be further noted that Chairman Strauss occupies a dual role. He is not only the Chairman of the Atomic Energy Commission, but also special advisor on atomic energy affairs to the President. It appears from a study of the Senate subcommittee hearings that Chairman Strauss was asked to testify as Chairman of the Atomic Energy Commission concerning conversations he may or may not have had with the President or his White House assistants. If it should appear that the inquiry was put to Chairman Strauss as the President's special advisor, or if it should develop that the conversations in question took place when Strauss was acting as the President's special advisor, there is absolutely no question that the precedents hold that the executive privilege and the President's direction concerning the exercise of the privilege apply to the subcommittee inquiry of Chairman Strauss.

## III.

Chairman Strauss states in his letter to the Attorney General that a suggestion was made by the Senate Subcommittee that the executive privilege was not available, within the doctrine laid down by the Supreme Court in the Teapot Dome cases, because of possible fraud in connection with the contract. It is the conclusion of this memorandum that the Supreme Court cases referred to do not create any fraud exception to the executive privilege, nor do the historical precedents create any such exception. There is historical precedent to the effect that where the question of fraudulent conduct by a government official is involved in a congressional investigation, the President, in the exercise of his unlimited discretion, may waive the right of an official to invoke the executive privilege. However, it should be noted that in the particular case with which this memorandum deals, there appears to be no evidence in the record of the Senate Subcommittee's hearings, or elsewhere, indicating any acts of fraud by the President, the President's White House advisors, Chairman Strauss, or any other government official or employee, with the possible exception of Adolph Wenzell. The General Counsel of the Atomic Energy Commission, in his opinion to the Commission in regard to the

Mississippi Valley Generating Company contract, found that the contract should be rescinded because of possible violation by Adolph Wenzell of a statute or public policy against conflict of interests. There was no finding of fraud on the part of any other governmental official or employee. As to Adolph Wenzell, the Senate Subcommittee interrogated him at great length and no information demanded of him was refused. It would not seem logical, assuming only for the purpose of argument that the Subcommittee's position is valid, that because one official may have defrauded the government, *ipso facto*, the executive privilege may not be validly asserted by any other official of the Executive Branch where there is no evidence of fraud on the part of such official or other officials with whom he may or may not have discussed the matter.

As pointed out, however, the cases of *McGrain v. Daugherty*, 273 U.S. 135 (1927), and *Sinclair v. United States*, 279 U.S. 263 (1929), which the Senate Subcommittee evidently was referring to as the Teapot Dome cases, do not in any way create an exception to the right of an officer or employee of the Executive Branch of the government to invoke the executive privilege in a congressional investigation when directed to, simply because the investigation concerns alleged fraudulent conduct in the government. The case of *McGrain v. Daugherty* involved an action against a private citizen for contempt of the Senate. Charges of misfeasance and nonfeasance in the Department of Justice in regard to the Teapot Dome matter had been made in the Senate. As a result of the charges, both the Senate and House passed two measures taking the Teapot Dome litigation out of the control of the Department of Justice, and authorized a select committee of five Senators to investigate the alleged failure of the Attorney General to take certain legal action and to investigate and report to the Senate the activities of the Attorney General and any of his assistants which would in any manner tend to impair their efficiency of influence as representatives of the government. In the course of the investigation, Mally Daugherty, the brother of Attorney General Daugherty, was properly served with a subpoena to appear before the Senate Committee as a witness. Mally Daugherty refused to obey the subpoena and contempt action was brought against him. It was argued that the purpose for which the witness's testimony was sought was not to obtain information in aid of the legislative function, and that any evidence of such intention by the Senate was an afterthought in an attempt to legalize the investigation. The Court said at page 178 of its opinion that the only legitimate object the Senate could have in ordering the investigation was to aid it in legislating. The Court, however, found that the subject matter involved was such that the presumption should be indulged that legislation was the real object. The Court noted that the power and duties of the Attorney General and the duties of his assistants are all subject to regulation by congressional legislation, and that the department is maintained, and its activities carried on, by yearly appropriations by Congress. The case stands for the proposition that investigation of the executive

departments for the purpose of obtaining information in aid of legislation is a proper function of Congress.

The case of *Sinclair v. United States* involved an action against a private citizen for contempt of the Senate. The case arose out of an investigation by the Senate of alleged fraud in the execution of the lease of naval oil reserve lands to the Mammoth Oil Company and a contract with the Pan American Petroleum and Transport Company. The Senate Committee was to report its findings to the Senate and determine if additional legislation were advisable. Harry F. Sinclair was subpoenaed as a witness and interrogated as to certain matters. Sinclair refused to answer certain questions on the grounds that the questions pertained to issues involved in pending litigation. It was argued that the Senate, by the adoption of a joint resolution requiring the President to place the subject of the investigation in litigation, had thereby deliberately removed its jurisdiction. The Supreme Court, in rejecting Sinclair's contention, held that the investigation was in aid of legislation, that under Article IV, Section 3, Congress has plenary powers to dispose of and to make all needful rules and regulations concerning public lands, and that the latter point was in itself a legal basis for the investigation. The Court also held that the Joint Resolution requiring the President to place the matter in litigation did not divest the committee of authority to ask the questions in issue. It was stated at page 295 that Congress was without authority to compel disclosures for the purpose of aiding the prosecution of pending suits, but that its authority to require pertinent disclosures in aid of its own constitutional power was not abridged because the information sought might also be of use in a lawsuit.

In the last session of Congress, Senator Knowland had printed in the Congressional Record an analysis of the power of Congress to require testimony, papers, and documents from the President and the Executive Branch. 101 Cong. Rec. 11,458–62 (July 26, 1955). Senator Knowland's analysis takes the position that there is a privilege in the Executive Branch to withhold information from Congress which the President or heads of departments feel should be kept confidential in the public interest. However, the analysis found an exception to the above proposition to exist in "cases where circumstances strongly point to wrongdoing of specific department officials (as in the Teapot Dome case), or when wholesale corruption is uncovered." *Id.* at 11,458. Senator Knowland discussed the Teapot Dome case. *Id.* at 11,461. After stating the limited holding of *McGrain v. Daugherty*, the Senator's analysis set forth the following letter from President Coolidge to Attorney General Daugherty. This letter is apparently the precedent for the so-called fraud exception. The letter reads:

THE WHITE HOUSE
Washington, March 27, 1924

MY DEAR MR. ATTORNEY GENERAL: Since my conference
with you I have examined the proposed reply you suggest making to

the demand that you furnish the committee investigating the Department of Justice with files from that Department, relating to litigation and to the Bureau of Investigation. You represent to me and to the committee in your letter that it would not be compatible with the public interest to comply with the demand, and wish to conclude your letter with a statement that I approve that position. Certainly I approve the well-established principle that departments should not give out information or documents, for such a course would be detrimental to the public interest and this principle is always peculiarly applicable to your Department, which has such an intimate relation to the administration of justice. But you will readily perceive that I am unable to form an independent judgment in this instance without a long and intricate investigation of voluminous papers, which I cannot personally make, and so I should be compelled to follow the usual practice in such cases and rely upon your advice as Attorney General and head of the Department of Justice.

But you will see at once that the committee is investigating your personal conduct, and hence you have become an interested party, and the committee wants these papers because of a claim that they disclose your personal conduct of the Department. Assuming that the request of the committee is appropriately limited to designated files, still the question will always be the same. In view of the fact that the inquiry related to your personal conduct, you are not in a position to give to me or the committee what would be disinterested advice as to the public interest. You have a personal interest in this investigation which is being made of the conduct of yourself and your office, which may be in conflict with your official interest as the Attorney General. I am not questioning your fairness or integrity. I am merely reciting the fact that you are placed in two positions, one your personal interest, the other your office of Attorney General, which may be in conflict. How can I satisfy a request for action in matters of this nature on the ground that you as Attorney General advise against it when you as the individual against whom the inquiry is directed necessarily have a personal interest in it? I do not see how you can be acting for your own defense in this matter and at the same time and on the same question acting as my adviser as Attorney General.

*Id.*

President Coolidge solved the above dilemma by asking for the resignation of his Attorney General, and the investigation proceeded from there. An examination of the cases and historical precedents indicates that there is no fraud exception to the executive privilege. Rather, there is historical precedent to the effect that the

President as Chief Executive can, in his sole discretion, direct that the executive privilege be waived in a case where he believes it is in the public interest. If the charges of fraud are directed against the President himself, the only way that Congress can constitutionally proceed is by way of impeachment. Even in this latter case there is no precedent to the effect that the executive privilege cannot validly be invoked.

## IV.

It is therefore concluded that the questions of the Senate Subcommittee put to Chairman Strauss on December 5, 1955, which Chairman Strauss refused to answer, come within the scope of the executive privilege to withhold information from Congress which the President deems confidential in the public interest; and that the President's letter of May 17, 1954, to the Secretary of Defense is a determination, applicable in this particular case, that the questions asked by the Senate Subcommittee are deemed by the President to be confidential. It is further concluded that the so-called fraud exception to which the Senate Subcommittee referred does not exist. The precedent for the so-called exception really evidences the unlimited discretion of the President to determine whether the public interest requires that the executive privilege be invoked or waived in a particular case.

J. DWIGHT EVANS
*Attorney-Adviser*
*Office of Legal Counsel*